334 A.2d 628
**In re ESTATE of Alice G. CLARK, Deceased.**

**Appeal of John H. SMITH.**

Supreme Court of Pennsylvania.

Argued Oct. 8, 1974.

Decided March 18, 1975.

Reargument Denied June 6, 1975.

54

Clifford A. Weisel, Byron D. Xides, Weisel, Xides & Conn, Pittsburgh, for appellant.

Martin W. Sheerer, Dillman, Sheerer & Schuchert, Pittsburgh, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

JONES, Chief Justice.

At issue on this appeal is whether the primary beneficiary under the Last Will and Testament of Alice G. Clark exerted undue influence upon the mind and person of the testatrix. The Orphans' Court Division tried the issue devisavit vel non and found that John H. Smith had procured the benefits of the residuary clause, which was the bulk of testatrix's estate, by undue influence, and thereby set aside the residuary clause of the will. We affirm.

Testatrix died on April 22, 1972, at the age of seventy-seven. She had been a widow since 1951 and was childless at the time of her death. Her last will and testament, dated November 12, 1971, made fourteen specific legacies totalling $56,000, among which were a $5,000 bequest to Harry Leech and his wife, Ruth Leech, and a $10,000 bequest to Lyda M. Smith the wife of the proponent, John Smith.

The balance of the estate was devised and bequeathed to John H. Smith as follows:

"My property at 1535 Fox Chapel Road shall go to John H. Smith, my beloved cousin and my executor of my estate. He is also to have the remains of my personal effects for his help and taking care of my well being in the past years. Also to my beloved cousin shall go my Trust Fund, which was set up by my late husband for me, as well as all other assets of my estate after all my bequests, and expenses are met. He shall serve as executor without bond. I do hereby make, constitute and appoint, John H. Smith, 622 Saxonburg Road, Pittsburgh, Penna. 15238 to be my executor of this my Last Will and Testament."

The will was admitted to probate on April 26, 1972. An appeal from the Register of Wills' order was filed by Harry S. Leech. He alleged that the decedent lacked testamentary capacity and/or that the contested writing was procured by undue influence, duress and constraint practiced upon the decedent by John H. Smith. Mr. Smith is a first cousin of decedent. Mr. Leech, the only other relative of the decedent, is a nephew. Under the Pennsylvania law then in effect, Intestate Act of April 24, 1947, P.L. 80, § 3 (20 P.S. § 1.3), John Smith would not share in the intestate estate of the decedent since Harry Leech would take any intestate portion of the estate to the exclusion of all others.

A hearing before the Orphans' Court resulted in a finding that the testatrix possessed testamentary capacity on the date she executed the will. However, the hearing judge found that John H. Smith asserted undue influence on the testatrix, ordered that the residuary clause and the appointment of the executor be set aside, and directed the revocation of the letters testamentary which had previously been granted to John H. Smith. The fourteen specific legacies of the will, including the $10,000 bequest to John Smith's wife, Lyda, were sus-

tained. Both sides filed exceptions which were dismissed by the court en banc, and a final decree was entered on April 15, 1974. Only John H. Smith has appealed.

The resolution of a question as to the existence of undue influence is inextricably linked to the assignment of the burden of proof. Once the proponent presents evidence of the formality of probate, a presumption of lack of undue influence arises; the effect is that the risk of non-persuasion and the burden of coming forward with evidence of undue influence shift to the contestant. *Abrams Will*, 419 Pa. 92, 98, 213 A.2d 638, 641 (1965) ; *Kerr v. O'Donovan*, 389 Pa. 614, 623, 134 A.2d 213, 217 (1957).[1] Once the contestant proceeds with his proof, there are two viable rules of law in this Commonwealth which allow the contestant to shift the onus of going forward with evidence back to the proponent. The older rule is that where the evidence shows (1) bodily infirmity and (2) greatly weakened mental capacity of the testator, and (3) a stranger to the blood of testator, (4) standing in a confidential relation, (5) who is benefited by a will (6) which he has been instrumental in having written, a *presumption* of undue influence arises. *See, Boyd v. Boyd*, 66 Pa. 283, 293–94 (1870) ; *Wilson v. Mitchell*, 101 Pa. 495 (1882); *Stewart Will*, 354 Pa. 288, 296, 47 A.2d 204 (1946); *Quein Will*, 361 Pa. 133, 62 A. 2d 909 (1949). The more recent rule is that where (1) a

---

1. Pennsylvania law, as cited, is clear as to the burden of coming forward with evidence. The cited authorities are not clear regarding the risk of non-persuasion. As a general proposition, it appears that the risk of non-persuasion as to testator's sanity and as to the absence of undue influence is upon the proponent of the will. But once the presumption of no undue influence is raised by the mere formality of admitting into evidence the record of the probate of the will, then the risk of non-persuasion is upon the contestant. Thus, in reality, at the trial of this issue devisavit vel non, the risk of non-persuasion is always upon the contestant, for it is he who is affirmatively asserting the existence or non-existence of certain facts. *See*, 57 Am.Jur. Wills, § 386; IX Wigmore, Evidence, § 2502 (3d ed. 1940). Annot. 154 A.L.R. 595 (1945); Annot. 66 A.L.R. 258 (1930).

person in a confidential relationship (2) receives the bulk of the testator's property (3) from a testator of weakened intellect, the burden of proof is upon the person occupying the confidential relation to prove affirmatively the absence of undue influence. *Cuthbertson's Appeal*, 97 Pa. 163, 171 (1881); *Yorke's Estate*, 185 Pa. 61, 69, 39 A. 1119 (1898); *Button Estate*, 459 Pa. 234, 240, 328 A.2d 480, 483 (1974), and cases cited therein at n. 6.

The parallel development of these two rules has been unnecessary. The differentiation arose from the facts of *Boyd v. Boyd, supra*, which could have relied upon the tripartite test but chose to incorporate the six elements of the older rule because the additional elements were present in that case, and they naturally enhanced the strength of the presumption of undue influence. Some of the cases have cited both rules. *Hurst Will*, 406 Pa. 612, 617, 179 A.2d 436, 438 (1962); *Kerr v. O'Donovan*, 389 Pa. 614, 627–28, 134 A.2d 213, 219 (1957). And although most of the cases citing the older rule have insisted that all six elements must be present, the cases citing the latter rule are equally adament that only the three elements of confidential relationship, weakened intellect and substantial benefit to proponent are the minimum requirements.

The first rule states that a *presumption* of undue influence is created; the second rule states that the *burden of proof* shifts to proponent to affirmatively disprove undue influence. But the procedural effect of either rule is the same: both rules act to shift the burden of going forward to the proponent. These rules define for the contestant what is his prima facie case. Generally, undue influence, being somewhat akin to fraud, must be proved by clear and convincing evidence. *Brantlinger Will*, 418 Pa. 236, 210 A.2d 246 (1965). The rules, whether couched in terms of presumption or burden, are substitutes for the clear and convincing evidence in that they satisfy the contestant's requirements of a prima fa-

cie case. Once the contestant has established the presumption or shifted the burden, the proponent must produce clear and convincing evidence which demonstrates affirmatively the absence of undue influence. *Button Estate, supra.*[2]

The arguments of both counsel, and the opinions of the Orphans' Court judge and the court en banc, were predicated upon the older six-pronged rule. Much of the discussion centered around the question of whether the proponent John H. Smith was a stranger to the blood of the testatrix. For purposes of assigning the burden of going forward we may ignore this question since it is surplusage to this evidentiary issue in light of the fact that we require a showing only of weakened intellect, confidential relationship and substantial benefit to the proponent for the contestant to establish his prima facie case. Admittedly, the other three factors of the older rule reflect upon the ultimate issue of undue influence, but the initial issue is whether the contestant has made out a prima facie case before we need even consider the evidence in favor of the proponent.

Contestant's twenty witnesses painted the following picture. Testatrix was an elderly woman in her mid-seventies who had lived alone as a widow since 1951, caring for herself and handling most of her own business affairs for most of this time. From 1967 until her death, she was hospitalized nine times. She suffered from hypertension, anxiety, and depression, probably stemming from loneliness and a chronic psoriasis condition of the skin. During Mrs. Clark's hospitalization from December 23, 1970 to January 5, 1971 (ten months before she executed the will) she suffered from cerebral arteriosclerosis and arteriosclerotic heart disease, commonly known

2. Our conclusion that both rules provide the same procedural effect is buttressed by the fact that several cases have used the terms "presumption" and "shift of burden of proof" interchangeably. *Hollinger Will*, 351 Pa. 364, 367, 41 A.2d 554 (1945); *Adams Estate*, 220 Pa. 531, 69 A. 989 (1908).

as hardening of the arteries. Her doctors described this ailment as an incurable, progressively degenerative disease which interfered with the flow of blood to the brain. Mrs. Clark exhibited the classic symptoms of the disease, i. e., the ability to recall matters from the distant past while being unable to absorb current matters. She exhibited cyclic changes which allowed her to appear normal and lucid during some intervals. Her doctors rendered an opinion that this condition would necessarily deteriorate by the time she signed the will in November of 1972. One doctor related that he did consider a commitment for Mrs. Clark but finally concluded that her demented condition during this hospitalization was not serious enough to require commitment to a mental hospital.

During her final hospitalization from January 18, 1972 (two months after the will was signed) to March 8, 1972, Mrs. Clark was in a constant state of "confusion and disorientation." Her doctor firmly concluded that these symptoms were a result of the pre-existing arteriosclerosis. Her attending nurses described periods of hostility, belligerency, and disruptive conduct. Several lay witnesses, including the contestant and his wife, testified that during the last two years of her life, Mrs. Clark showed "dependence," "confusion," "forgetfulness," "repetition," and "disorientation."

The contestant's testimony showed that Harry Leech and his wife were very attentive and very close to the decedent up to the time of her death. Mrs. Clark treated Harry Leech as "a son." During the last few years of decedent's life, John Smith befriended the testatrix and gradually assumed more and more of Alice Clark's business duties. Years earlier, after Mrs. Clark's husband had died, John Smith had handled the auction of some of Mr. Clark's personal property. Afterward, Mrs. Clark had occasionally referred to Mr. Smith as a "crook." However, on November 12, 1971, the date of decedent's

will, she visited her bank with Mr. and Mrs. Smith and informed the bank manager that she wished to designate Mr. Smith as her attorney to sign checks on her account, and she signed a power of attorney to that effect.

By the terms of the contested will, the proponent was to receive the lion share of the decedent's assets. He would receive all but $56,000 of an estate estimated to be $190,000.

Contestant established his prima facie case and shifted the burden of coming forward with clear and convincing evidence to the proponent. Weakened intellect need not amount to testamentary incapacity. *Stewart Will, supra. See Williams v. McCarroll*, 374 Pa. 281, 297, 97 A.2d 14, 20 (1953). Further, a confidential relationship could be found to exist. Such a relationship appears "when the circumstances make it certain that the parties did not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed." *Leedom v. Palmer*, 274 Pa. 22, 25, 117 A. 410 (1922). As Justice Roberts has stated:

"[I]f there be any clearer indicia of a confidential relationship than the giving by one person to another of a power of attorney over the former's entire life savings, this Court has yet to see such indicia." *Foster v. Schmitt*, 429 Pa. 102, 108, 239 A.2d 471, 474 (1968).

Although the contestant's evidence did not demonstrate that John Smith had control over Alice Clark's *entire* life savings, the hearing judge's conclusion that the contestant established, prima facie, a confidential relationship between the deceased and John H. Smith is clearly supportable by the evidence of the power of attorney over her sizable checking account.

The proponent's evidence, to some degree, helped to strengthen the contestant's case. Smith was very atten-

tive to Alice Clark's needs in the last months of her life. After November 8, 1971, Smith retained all of Alice's stock certificates, bonds, and deeds in his home. On December 6, 1971, Mrs. Clark gave Smith a passbook for a savings account in her name with a withdrawal slip for the entire amount. She said that she wanted $1,500 in cash for Christmas presents and that John Smith was to take the balance of the account ($21,500) as a gift. This "gift" amounted to nearly ten percent of Mrs. Clark's assets at that time.

Mr. Smith had several lay witnesses who testified that Alice Clark's mind was clear and unfettered during the period immediately surrounding the execution of the will. A bank secretary testified that when Mrs. Clark came to the bank on November 12, 1971, the same day she executed her will, she signed a power of attorney in favor of John Smith and engaged in several other personal financial affairs in a very lucid, assured, and businesslike manner. Doctor Tiegel treated Alice Clark regularly and last saw her on November 8, 1971. He testified that she was lucid during all of the office visits and that on November 8 she would have been capable of executing a legal document if it was explained to her. She comprehended everything that was said to her, but she would digress "into things she had done in the past." (Significantly, all other medical testimony was based upon observations which were at least two months removed from the date of execution of the will). Other lay witnesses testified for the proponent that they had engaged in normal business relationships with the decedent during the fall of 1971.

This Court has often stated that where testamentary capacity is at issue, the real question is the condition of the testator at the very time he executed the will, and, although evidence as to capacity which is reasonably distant from the time of execution is admissible as indicative of capacity on the particular day, testimony

as to testatrix's condition close to that time must be considered more significant. *Brantlinger Will,* 418 Pa. 236, 248, 210 A.2d 246, 253 (1965); *Lanning Will,* 414 Pa. 313, 317, 200 A.2d 392 (1964). However sound that rule is, it cannot be imposed upon the law of undue influence. As we said before, weakened mentality as relevant to undue influence need not amount to testamentary incapacity. Undue influence is generally accomplished by a gradual, progressive inculcation of a receptive mind. The "fruits" of the undue influence may not appear until long after the weakened intellect has been played upon. In other words, the particular mental condition of the testatrix on the date she executed the will is not as significant when reflecting upon undue influence as it is when reflecting upon testamentary capacity. More credence and weight may be given to the contestant's remote medical testimony.

The circumstances immediately surrounding the writing and execution of the will were peculiarly within the proponent's knowledge. He testified that at the decedent's direction, he wrote the will by hand as it was dictated to him by Mrs. Clark. He then procured a typewriter and paper and delivered them with the handwriting to a Mrs. Curtis, whom proponent paid to type the will. John Smith picked up the finished product on November 13, 1971, took it to Alice Clark and watched her sign it. He then obtained the signatures of Margaret Hamilton and Nell Martin as witnesses. Neither saw Mrs. Clark sign the will, and neither knew that it was a will she was witnessing. Both ladies, however, recognized the signature of Alice Clark and both spoke with the decedent on November 13 and found her in good spirits and mentally normal. John Smith took the will and all copies to his home where they remained until after Alice Clark's death.

The test to be applied by an appellate court on review is not whether the appellate court would have

reached the same result, but rather whether the findings of fact approved by the court en banc are based upon legally competent and sufficient evidence and whether the court below committed an error of law or abused its discretion. *Treitinger Will,* 440 Pa. 616, 624, 269 A.2d 497, 501 (1970); *Williams v. McCarroll,* 374 Pa. 281, 298, 97 A.2d 14, 22 (1973).

In finding for the contestant, the hearing judge assessed the secrecy surrounding the execution of the challenged will as a factor which weighed heavily against the proponent. That proponent is the scrivener of the will indeed weighs heavily against him. *Stewart Will,* 354 Pa. 288, 47 A.2d 204 (1946).

In the early case of *Blume v. Hartman,* 115 Pa. 32, 40, 8 A. 219 (1887), the Supreme Court found sufficient evidence to support a verdict of undue influence practiced by a son upon his mother. In discussing the lack of testimony corroborating the proponent's story, the Court said:

"[T]he plaintiff, unfortunately, perhaps, for himself, chose to conduct his proceedings in the procurement and the preparation of the will, and in the inducements to his mother to sign it, secretly and by himself alone. There is absolutely no evidence whatever except his own to support his own allegations as to his communications with her. Apparently he was not even willing to suffer the presence of a lawyer, though employed by himself, at his interviews with his mother. *He is directly responsible, therefore, for every inference which may fairly be made against him as to means he employed to obtain the assent of his mother to the execution of the will in question.*" (Emphasis supplied)

The decedent and John Smith were alone when the will was executed. The hearing judge had only John Smith's testimony as to what the decedent ex-

pressed as her testamentary intent and as to what her condition of mind was. These parties were alone again when the decedent transferred her securities to him and when she made a gift of $21,500 to him. We have previously recognized that undue influence is a "subtle," "intangible" and "illusive" thing and that therefore, we must allow it to be established by circumstantial evidence. *Quein Will,* 361 Pa. 133, 146, 62 A.2d 909 (1949). Our cases cannot be decided on the basis of suspicion and conjecture, but in a will contest, the assessment of the secrecy of relationships, not unlike the evaluation of credibility of the witnesses, must be a factor which is properly within the sole discretion of the trier of fact. We do not think that the hearing judge has abused his discretion.

Decree affirmed. Costs on appellant.

EAGEN, J., concurred in the result.

ROBERTS, J., filed a concurring opinion in which POMEROY, NIX and MANDERINO, JJ., join.

ROBERTS, Justice (concurring).

I agree with the majority that where one contesting a will establishes 1) that a person in a confidential relationship with the testator 2) receives a substantial benefit under the will and 3) that the testator was of weakened intellect, a presumption of undue influence arises. The effect of this presumption is to shift the burden of producing evidence and the risk of non-persuasion on the issue of undue influence to the proponent.

However, I cannot agree with the majority's assertion that this presumption is a "substitute" for clear and convincing evidence. The presumption is merely a means by which a contestant can establish undue influence circumstantially by proving opportunity for the exertion of undue influence and the possible fruits thereof.

**68**

We have previously held that a contestant who seeks to prove undue influence directly must do so by clear and convincing evidence. *Brantlinger Will*, 418 Pa. 236, 250, 210 A.2d 246, 254 (1965). There is no reason in policy or logic why a contestant attempting to show undue influence circumstantially should not also be required to come forward with clear and convincing evidence.

Once the presumption has been established, the proponent can prove the validity of the challenged gift by clear and convincing evidence that it was not the result of undue influence. *Button's Estate*, 459 Pa. 234, 240–241, 328 A.2d 480, 484 (1974).

Because the record establishes that the factors required to raise the presumption were proven by clear and convincing evidence, I concur in the result reached by the majority.

POMEROY, NIX and MANDERINO, JJ., join in this opinion.