## Cleaver Will

*Craig S. Boyd*, for contestants.

*Leo H. Eschbach*, for executrix.

404

OPINION BY TREDINNICK, J., SEPTEMBER 24, 1981 :

The issue in the present proceeding is whether the will admittedly executed by the decedent, Alice Y. Cleaver, on August 13, 1980, is invalid as the product of undue influence. The will was probated, an appeal was filed, and the matter was certified to the Orphans' Court Division pursuant to §908 of the PEF Code.

Alice Cleaver, testatrix, died on October 16, 1980. She was survived by her daughter, Pauline Angstadt, and the four children of her deceased son, Clifford R. Cleaver. These grandchildren, Nancy Reigel, Clifford Cleaver, Robert Cleaver, and Allen Cleaver, are the contestants in this appeal from probate.

On October 24, 1980, the register of wills probated a certain writing dated August 13, 1980 as testatrix' last will. This document left decedent's entire estate to Pauline Angstadt and appointed her executrix. It revoked decedent's prior will dated February 4, 1964. The prior will appointed her son Clifford, executor, directing him to liquidate all of her real and personal estate, to place one-half of the proceeds into a life trust for the benefit of Pauline and to give the remaining interest outright to Clifford. The 1964 will directed that upon the death of Pauline, $1,000 shares of the balance remaining in the trust be distributed to her four grandchildren and gave the remainder to Clifford or his issue.

The appeal from probate alleged that the testatrix lacked testamentary capacity when the challenged writing was executed, that it was procured by the undue influence of Pauline Angstadt, and that Pauline practiced fraud on the testatrix in order to induce her to execute the will. The allegations of testamentary incapacity and fraud, however, have been abandoned.

A hearing was held on June 9, 1981. It was attended by contestants and their witnesses, the testatrix's physician, two staff members from the testatrix' nursing home, and the testatrix' daughter-in-law. The proponent did not appear at the hearing, but her witness, the scrivener of the contested will, was present and testified.

The history of the principals was extensively developed by testimony which presented the following picture:

Testatrix was an elderly widow in her late eighties who had lived alone since 1967. From March 1980 until her death she was hospitalized three times. She suffered from diabetes, arteriosclerosis, arteriosclerotic heart disease, arthritis, hypertension, labyrinthitis, and early Parkinson's disease. Testatrix exhibited the classic symptoms of arteriosclerosis. She had very good recollection of events from the distant past while being unable to recall recent matters. She suffered from dizzy spells, had difficulty walking, and was stubborn and sometimes suspicious. Testatrix showed dependence, confusion, and forgetfulness.

The contestant's evidence established that Pauline and the testatrix did not have a close relationship. They frequently argued and in early 1980 the testatrix accused Pauline of dishonesty in handling her money. From that time until the testatrix' first hospitalization Pauline and the testatrix had no contact. It was not until Pauline received a visit from the contestants in March 1980 that she began seeing her mother regularly. Contestants visited Pauline in March to discuss the testatrix' physical condition. Pauline was very agitated; she shouted and swore. She stated, "I know why you're here. You're in the will. If she dies tomorrow, bury her." The day after this incident Pauline visited the testatrix and was with her more or less constantly until her death.

Pauline attempted to prevent the contestants from seeing the testatrix. Contestants' mother testified that from the August hospitalization until testatrix' death she and the contestants felt great hostility from Pauline which prevented them from visiting the testatrix, particularly during the August hospitalization. On specific occasions Pauline physically blocked the contestants from seeing their grandmother and created such a disturbance that the contestants were forced to leave the testatrix' presence. The testatrix' physician and the director of admissions of the testatrix's nursing home both testified that Pauline did not want the testatrix to visit the contestants. There was, however, testimony that the testatrix wished to see her grandchildren. The testimony also revealed that Pauline is an extremely demanding and domineering individual and

that it is extraordinarily difficult to assert oneself during a conversation with her.

Pauline received a power of attorney from the testatrix in early August 1980. In that same month Pauline retained her personal attorney to draft a new will for the testatrix. Oddly enough, when the scrivener met with Pauline and the testatrix, Pauline suggested to the testatrix that an identical disposition as that of the 1964 will be made. Pauline was aware of the prior will and its contents.

In the case of *Estate of Clark*, 461 Pa. 52, 334 A2d 628, the Supreme Court of Pennsylvania enunciated the basic rules regarding will contests involving undue influence. Since the proponent has proven that the formalities of execution had been followed, the burden of proof rests initially upon the contestants to establish that "[a] person in a confidential relationship received the bulk of the testator's property from a testator of weakened intellect:" *Clark, supra,* at 632. Once these elements are established the burden of proof shifts to the proponent to "[a]ffirmatively demonstrate by clear and convincing evidence the absence of undue influence:" id. at 632. Proof of these elements may be accomplished through the use of circumstantial evidence: id. at 635.

In *Clark*, the court articulated the following principles regarding the three elements of a contestant's prima facie case. The court stated that "[w]eakened intellect need not amount to testamentary incapacity:" id. at 633. In other words, a testatrix may have testamentary capacity and still be the victim of the pressures of undue influence. In addition, the court stated "[u]ndue influence is generally accomplished by a gradual, progressive inculcation of a receptive mind. The fruits of the undue influence may not appear until long after the weakened intellect has been played upon:" id. at 634.

Although the Pennsylvania Supreme Court has not yet enunciated a clear definition of the term "weakened intellect," Judge Taxis in *Heffner Est.*, 92 Montg. 44, 49 has stated:

> "It (a weakened intellect) is . . . a mental state between a normal or unweakened intellect on one hand, and a lack of testamentary capacity on the other. Such an intellect, therefore, is one which in some circumstances can determine the truth and act upon it, but which in other circumstances does not function in a normal

or rational way, thus producing actions or decisions based on emotion, whim, suggestion of others or some other illogical or even unascertainable reasons. . . . The closest that we can come, therefore, to a definition of weakened intellect is that it is a mind which, in all the circumstances of a particular situation, is inferior to normal minds in reasoning power, factual knowledge, freedom of thought and decision, and other characteristics of a fully competent mentality. It should be viewed essentially as a relative state as the term is applied to cases of undue influence, as these always involve the effect on one intellect upon another; if the intellect of the testator is substantially impaired in comparison to that of the proponent or beneficiary it must be regarded as weakened since there could be no equal dealings between the two parties."

With respect to the confidential relationship element, the court in *Clark* noted "[a] confidential relationship appears when the circumstances make it certain that the parties did not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed:" *Clark, supra,* at 633. In addition, the court found the giving of a power of attorney over one's bank accounts to be a clear indicia of this relationship: id. at 633-634.

The last element, receipt of the bulk of testatrix' estate, is easily established by an examination of the terms of the contested will.

The contestants in the case at bar have established the necessary prima facie elements of undue influence, thus shifting to the proponent the burden of coming forward with clear and convincing evidence as to the absence of undue influence.

The record established that the testatrix was of weakened intellect at the time of the will's execution. The testatrix' intellect and will were substantially impaired, particularly in comparison to that of the proponent. There could be, and were, no equal dealings between the testatrix and the proponent. The contestants' witnesses testified to the extremely weakened physical and mental condition of the testatrix. The testatrix' doctor stated that because of her mental condition and because she felt alone, the testatrix could be influenced by whoever was with her.

There is also sufficient evidence to support a finding of a confidential relationship between the testatrix and the pro-

408

ponent. From March 1980 until the testatrix' death Pauline was constantly with the testatrix. She was responsible for her financial affairs at that time and was instrumental in the retaining of an attorney to draft the new will. In addition, the testatrix gave Pauline a power of attorney. Decedent was in declining health, physically and mentally, and had to depend on someone for support, both physically and psychologically. It is clear that this person was her daughter. Under the totality of these circumstances, a confidential relationship existed.

It is undisputed that Pauline is to receive the testatrix' entire estate under the terms of the contested will, and that this was a substantially greater benefit than that which would have inured to her under the terms of the prior will.

The remaining question for determination is whether the proponent has affirmatively demonstrated by clear and convincing evidence the absence of undue influence. The proponent neither appeared nor testified in these proceedings. Her only witness was the scrivener. The circumstances involved in this case are peculiarly within the proponent's knowledge and without her testimony, it cannot be said that she demonstrated the absence of undue influence by "clear and convincing evidence." While the scrivener testified that the proponent appeared to put no pressure on decedent during his conference with decedent, or during execution of the will, that is hardly clear and convincing proof that proponent had not done so theretofore.