506 A.2d 451

**ESTATE OF Nathaniel F. COOPER, Deceased.**

**Appeal of Neil S. COOPER, E. Gerald Cooper.**

Superior Court of Pennsylvania.

Argued Dec. 18, 1985.

Filed March 20, 1986.

Gerald F. Ragland, Jr., Philadelphia, for appellants.

Before CIRILLO, MONTEMURO and POPOVICH, JJ.

CIRILLO, Judge:

This is an appeal from an en banc decree of the Court of Common Pleas of Philadelphia County. At issue is a will disposing of the estate of Nathaniel F. Cooper, who during his lifetime amassed several million dollars.

Contestant, testator's son from his first marriage, appealed from the probate of the will at issue, claiming that his stepmother, proponent of the will, exerted undue influence upon testator, thus forcing him to leave virtually everything to her to the exclusion of contestant. After hearings on the matter, the Honorable Kendall Shoyer concluded the will was indeed the product of undue influence. Accordingly, the will was declared invalid, set aside, and testator's last previous will was ordered probated. Upon exceptions by proponent, the matter was reviewed by the court en banc, which rejected Judge Shoyer's findings and ordered contestant's appeal from probate dismissed. The contested will was once again in effect. This appeal by contestant followed.[1]

1. Proponent Roslyn Cooper died on May 6, 1985. Her estate is now represented by E. Gerald Cooper, her son by testator (contestant's halfbrother).

Judge Shoyer, in concluding that the contested will was the result of undue influence, outlined in considerable detail the testimony and circumstances upon which his decision was based. In condensed form, those findings are as follows.

Testator Nathaniel Cooper was a man of boundless energy and unsurpassed business acumen. Through a series of shrewd investments, he made himself a millionare in Horatio Alger fashion. He owned posh homes in Philadelphia, Manhattan, and Long Island, and was attended to by a chauffer and a battery of butlers and maids.

In 1958, testator suffered a massive stroke. His speech became slurred, and his walk was reduced to a shuffle. His weight dropped to the point of giving him a "skeleton" appearance. At times, others would have to cut his food for him. With utter indifference, he would sometimes urinate wherever he stood. He became hypochondriacal, carrying with him a suitcase filled with various medications. With regularity, he checked himself into a New York hospital for brief periods. He would only make important business decisions in the morning, because by afternoon he was fatigued.

Partially as a result of the many drugs he ingested, testator became an anxious, depressed man. He was a fearful shell of his former self. Through his depression, his wife Roslyn remained his one "shining star". She received frequent and substantial largess from testator; in fact, the Long Island home was in her name outright. She meant everything to testator, and the thought of losing her made him utterly despondent.

Nonetheless, at those times when he was making business decisions, he retained a remarkable mental acuity and firmness of conviction, as testified to by his stock broker and the scrivener of the contested will. He remained a voracious reader of as many business and investment publications as he came across. His secretary testified that no business decision of any importance could be made without his approval. As certain medical testimony revealed, testa-

tor's particular physical condition allowed for this apparent contradiction between strength of mind at certain times and total discomposure at the thought of losing Roslyn.

Testator repeatedly stated his love and affection for contestant. He paid for his Ivy League education in full. Later, he loaned his son $3,000.00 for business purposes, but only after contestant explained the reasons for the loan to Roslyn. Even when testator was regularly checking himself into a New York hospital, contestant drove once a month to New York to have lunch with his father. Testator once said of his son, "Someday he will be a very wealthy man."

Roslyn had a strong hand in family affairs, sometimes extending into the business realm. Once, testator decided to sell most of his stock in Penn Food, Inc. Roslyn, concerned that her son Gerald's job might be in jeopardy because he had recently begun working at Penn Food, threatened to sue her husband (in her capacity as partner in the venture) if he went through with the sale; testator succumbed and did not sell. On another occasion, testator refused to loan $10,000.00 to contestant because of the latter's strained relationship with Roslyn. Said testator to his son: "If you could only get on good terms with Roslyn. I could do a lot more for you, but she knows every step I'm up to and she will make my life hell."

During his lifetime, testator executed powers of attorney on two separate occasions. One, shortly after his stroke, was in favor of long time friend Bernard Segal and Roslyn. The other was executed just prior to a hospital stay; this one was solely in favor of Roslyn. Both were subsequently revoked.

Testator executed a number of wills throughout his lifetime prior to the one at issue. Their terms differed in various respects, but contestant's status as a principal beneficiary remained constant; under the contested will, he

is only an alternate beneficiary.[2]  In fact, testator executed a will only three days prior to the one at issue, and contestant was a principal beneficiary therein.  During the intervening weekend, Roslyn was at the Long Island home, while testator remained in Philadelphia.  The two spoke by telephone, but the substance of the call remains unknown (Roslyn's testimony was deemed lacking in credibility).  It does appear clear, however, that the call did bear directly on the will change.  Testator went to one of his attorneys and demanded a new will leaving almost everything to Roslyn. Counsel warned, to no avail, that the tax consequences of such a will would be extremely harsh.  By subsequent codicil, testator's friend Bernard Segal was removed as executor, and in a later telephone conversation, testator seemed quite relieved that Mr. Segal did not press him to explain the change of executor.  Judge Shoyer could find absolutely no explanation for this sudden and dramatically inconsistent change in the will.

One who challenges a will on the grounds of undue influence must establish that: 1) the person exerting such influence stands to benefit greatly by the contested will, 2) the testator was of weakened intellect, and 3) the testator stands in a confidential relationship with the person exerting influence.  *Estate of Reichel,* 484 Pa. 610, 400 A.2d 1268 (1979); *Estate of Bankovich,* 344 Pa.Super. 520, 496 A.2d 1227 (1985).  There is no precise formula for finding a confidential relationship, but generally it will be found when one justifiably reposes his trust in the hands of another who possesses some overmastering influence.  This trust is given with confidence that it will be used in the testator's best interests.  *Bankovich, supra; Estate of Buriak,* 342 Pa.Super. 371, 492 A.2d 1166 (1985).

In the present case, it is beyond question that proponent stood to receive a substantial sum under the contested will. However, a review of the evidence by the court en banc led

**2.**  E. Gerald Cooper was also a principal beneficiary under each will except the final one.  However, he does not face contestant's dilemma, for he stands to receive all that which is allotted to his mother's estate.

it to the conclusion that neither a weakened intellect nor a confidential relationship was proven by clear and convincing evidence.

Noting that the marital relationship is not confidential per se, the court concluded that Judge Shoyer's wholesale reliance on the execution of powers of attorney in support of finding such a relationship was misplaced, since they were issued long before his death and were both revoked. The court also found it important that nothing was known of Roslyn's role in *obtaining* the powers of attorney. The relevance of this last consideration escapes us, since the issue is whether the powers of attorney pointed to a confidential relationship in the proof of undue influence, and not whether the powers of attorney were themselves the result of undue influence. In any event, it appears that in reality Judge Shoyer also considered the need for Roslyn's approval for loans to the family, her status as a joint partner in Penn Food, and her knowledge of "every step" taken by testator in concluding that there was a confidential relationship.

Concerning weakened intellect, the court observed that contestant's medical witnesses, on which Judge Shoyer relied in reaching his conclusion, never examined testator personally, whereas proponent's medical witnesses had known him for some time. Aside from the fact that it was this very friendship with testator that reduced the credibility of those witnesses in Judge Shoyer's view, we are aware of no rule demanding that a medical witness must personally examine a subject in order for his testimony to be found credible.

Further, the en banc court could find nothing upon which to base a finding of undue influence generally. In this connection, the court observed that although there was testimony indicating testator's susceptability to undue influence, such influence was not actually proven. No weight can be given to this particular observation, since it is well settled that undue influence may be demonstrated by cir-

cumstantial evidence. *Estate of Ziel,* 467 Pa. 531, 359 A.2d 728 (1976); *Estate of Clark,* 461 Pa. 52, 334 A.2d 628 (1975).

■ The en banc court sat in a reviewing capacity, and thus its scope of review was identical to that which constrains this Court. In *Bankovich,* 344 Pa.Super. at 522–523, 496 A.2d at 1229, we observed that we are

"... limited to determining whether the findings of fact ... rest on legally competent and sufficient evidence, and whether an error of law has been made or an abuse of discretion committed." *In re Estate of Ziel,* [supra, 467 Pa. at 536, 359 A.2d at 731]; *In re Estate of DiPietro,* 306 Pa.Super. 238, 240, 452 A.2d 532, 533 (1982). "It is not our task to try the case anew." *In re Estate of Ross,* 316 Pa.Super. 36, 40, 462 A.2d 780, 782 (1983). "This rule is particularly applicable 'to findings of fact which are predicated upon the credibility of the witnesses, whom the judge has had the opportunity to hear and observe, and upon the weight given to their testimony.' " *Estate of Gilbert,* 342 Pa.Super. 82, 87, 492 A.2d 401, 404 (1985), (quoting *In re Estate of Dembiec,* 321 Pa.Super. 515, 519–520, 468 A.2d 1107, 1110 (1983)).

We hold that beyond the misapplication of certain legal principles discussed *supra,* the en banc court improperly substituted its own judgment for that of the hearing judge. For this reason, we reverse.

The en banc court stated the appropriate standard of review at the outset of its opinion and again in its conclusion. However, the balance of the opinion belies any adherence to that principle. For example, after noting that Judge Shoyer found two of proponent's medical witnesses lacking in credibility, the court forged ahead, elaborating upon their credentials and highlighting their testimony where it was inconsistent with the testimony Judge Shoyer did find convincing.

In the same vein, in concluding that the inconsistency between testator's unwavering business acumen and helplessness at the hands of Roslyn could not be explained, the court decided that Judge Shoyer did not place sufficient

emphasis on the testimony of the scrivener, testator's secretary, and his stock broker, all of whom saw no signs of mental weakness. It concluded in part: "In view of the credible evidence presented, we cannot agree that contestant has proven by clear and convincing evidence that decedent was of weakened intellect ...." Whether the court agreed with Judge Shoyer is wholly irrelevant; indeed, it is the very antithesis of the well settled rule dictating that the chancellor's finding simply be one that a reasonable judicial mind could reach. In light of testimony explaining testator's condition as allowing for total conviction in some situations and helplessness in others, Judge Shoyer's finding cannot be deemed unreasonable.

Further, since undue influence may be demonstrated through circumstantial evidence, the chancellor's conclusion that no explanation existed for the sudden will change is not itself unreasonable. As Judge Shoyer observed, the most telling circumstance in this connection was the fact that testator drafted a series of wills, all of which accounted for contestant, and with no ascertainable change in affection for his son cut him out of the final will. On appeal, proponent suggests that the sudden will change was the natural consequence of recent adverse effects of the stock market upon the estate, as well as contestant's independent business success. At a minimum, this position overlooks the fact that the last will in which contestant was included was executed only three days prior to the contested will.

The court's decision was founded upon a public policy concern, namely, the potential deterioration of the special status which the law accords the marital relationship. The court states that it is not a judge's place to meddle in the complexities of the marital relationship. We agree with the court's insight that every marriage involves certain concessions which may seem outwardly imprudent but are nonetheless made to keep the marital peace. However, we question whether a son's exclusion from a multi-million dollar estate can adequately be categorized as such a grudging concession. The special status which the law

accords the marital relationship must not be used to arm a spouse with an impenetrable shield to ward off the claims of other family members to whom the bounty of the estate was intended to flow.

Regardless, such matters of public policy cannot serve as a vehicle for the dilution of the important constraints imposed upon appellate judicial review. From the evidence presented, a judicial mind could reasonably find, as Judge Shoyer did, that the contested will was the result of undue influence.

In conclusion, we consider proponent's argument that contestant's appeal from probate was time barred. The will was admitted to probate in January of 1975. Contestant appealed in October, 1976, approximately 22 months later; at that time, 20 Pa.C.S. § 908(a) required all such appeals to be taken within one year of probate.

■ The one year appeal period did not come into effect until July, 1976, which was after the probate of the will, but before the appeal was taken. At the time of probate, § 908(a) provided a two year period for appeals. Thus, at the time contestant's right to appeal accrued, the two year statute of limitations was in effect. As 1 Pa.C.S. § 1976(a) dictates, civil provisions in a statute shall not impair a right existing or accrued. The action may proceed under the statute as it existed when the action began. Further, the limitations period impacts directly upon a substantive right and thus should not be applied retroactively because the legislature did not clearly indicate otherwise. *See Miller v. Commonwealth Department of Transportation*, 91 Pa. Cmwlth. 622, 498 A.2d 1370 (1985); *Costa v. Lair*, 241 Pa.Super. 517, 363 A.2d 1313 (1976). Since contestant did appeal within the original two year limitation period, we reject proponent's argument as meritless.

Reversed and remanded to allow for the probate of the will of July 13, 1973. Jurisdiction is relinquished.

POPOVICH, J., dissents.