J-A10042-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ESTATE OF NANCY LYNN LANDIS, DECEASED | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: JONATHAN LANDIS | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2105 EDA 2019 |

Appeal from the Order Entered June 25, 2019
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s):  2016-X4106

BEFORE:  BOWES, J., SHOGAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    **FILED JUNE 23, 2020**

Jonathan Landis (Landis) appeals the order of the Court of Common Pleas of Montgomery County Orphans' Court (orphans' court) denying his petition to declare invalid a change of his beneficiary form regarding the Individual Retirement Account (IRA) of his mother, Nancy Lynn Landis (the Decedent).  He argues that the document purporting to reduce his 100% share should be set aside, entitling him to the entire sum.  We affirm.

**I.**

The Decedent contributed to her employer's 401(k) retirement fund for over thirty years, accumulating about $600,000 by the time it was converted

_____

[*] Retired Senior Judge assigned to the Superior Court.

to an IRA.[1]  On February 22, 2016, Landis was designated the sole primary beneficiary of the IRA, and his three children were made contingent beneficiaries.

In June 2016, the Decedent was diagnosed with a cancerous brain tumor, and in July, she began receiving medical care, including neurosurgery. While recovering, the Decedent frequently consulted her long-time friend and financial advisor, Robert Bruce Musselman (Musselman), to manage her affairs.  About a month after the cancer diagnosis, the Decedent made a will, naming Landis as the sole beneficiary.  Her sister, Ruth Elaine Lawrie (Lawrie), was made the executrix.

On August 31, 2016, the Decedent made changes to the beneficiaries of non-probate assets which are not at issue in this appeal.  Those assets include a pension on which Lawrie and Jack Norsworthy (Norsworthy), the Decedent's boyfriend, completely replaced Landis as beneficiaries.   Landis was also replaced as primary beneficiary by Lawrie and Norsworthy on the Decedent's Sun Life Financial life insurance policy.  The Decedent had intended to remove Landis as the beneficiary of a State Farm life insurance policy in favor of his three children (the Decedent's grandchildren), but Lawrie did not submit the required paperwork in time prior to the Decedent's death.

---

[1] The relevant facts are taken from the trial court's opinion and the certified record.

For the next few months after her diagnosis, the Decedent resided in an assisted living facility, and by November 9, 2016, her health had severely deteriorated to the point that the family decided to admit her to a hospital. By the next day, the Decedent largely lost the ability to communicate and was semi-comatose.

On the morning of November 11, 2016, she received a high dose of steroids which made her much more alert. However, despite the apparent improvement in her condition, the Decedent's doctor explained that no further treatments were viable and that the family should arrange for hospice care. The Decedent was troubled and confused by the doctor's assessment but did not exhibit confusion in any other respect. In fact, the treating doctor wrote in her evaluation for that day that the Decedent's speech and thought processes appeared to be "normal."[2] After receiving the doctor's news, the Decedent spent time with her family and asked to speak with Musselman, who arrived later that day.

Though the Decedent had made or attempted to make beneficiary changes as to several non-probate assets in August 2016, she had never

---

[2] The parties stipulated to the deposition testimony of the Decedent's treating oncologist, Dr. Tara Morrison, who described her mental processes following the removal of the brain tumor on July 5, 2016, as having markedly declined. **See generally** Deposition of Dr. Tara Morrison, M.D., 5/23/2018, at pp. 41-42. As to the Decedent's mental state and capacity on the date of her death, Dr. Morrison referred to observations in her evaluation notes that she appeared to have normal behavior, speech and judgment. **See id**. at p. 120.

explicitly discussed with anyone the prospect of changing her IRA beneficiaries. Nevertheless, Musselman brought with him to the hospital a change of beneficiary form for the IRA. At around noon, Musselman filled out the form by hand, reducing Landis' share from 100% to only 20% and naming Lawrie a 50% beneficiary. Norsworthy was made a 30% beneficiary. The Decedent signed the last page of the form and Musselman witnessed it. No contingent beneficiaries were named.

Musselman made a contemporaneous video recording of the Decedent specifying the above percentages. In the first attempt, the Decedent confused the names of the beneficiaries, so she started over. On the second attempt, the Decedent recited the 20/30/50 division between Landis, Norsworthy and Lawrie, respectively. *See* Trial Transcript, 9/17/2018, at pp. 50-51. According to Musselman, the Decedent made the changes in order for Lawrie to distribute the majority of her share to the Decedent's grandchildren and for Norsworthy to distribute a portion of his share to his own grandchildren.

Musselman left the hospital after his meeting with the Decedent ended. He learned on his drive home about an hour after leaving that the Decedent had passed away. A few days later, Musselman replaced the handwritten change of beneficiary form with a typed version, attaching the signed and witnessed signature page that was part of the handwritten version prepared at the hospital. The original handwritten form was subsequently lost or destroyed.

Musselman contacted the company responsible for the management and distribution of the Decedent's IRA funds, Voya Financial (Voya), and explained the circumstances in which the typed form was completed. He also disclosed that he took a video recording of the Decedent to corroborate that the form reflected her wishes. With that information in mind, Voya accepted the typed change of beneficiaries as reflected on the typed form. Musselman had also arranged to manage the IRA funds distributed to Lawrie.

Lawrie and Norsworthy testified that they were surprised to be added as IRA beneficiaries, and once notified by Musselman, they committed to abiding by the Decedent's instructions. Before the money could be dispersed, on September 8, 2017, Landis petitioned the orphans' court to invalidate the change of beneficiary form and recognize him as the sole beneficiary of the IRA funds in accordance with the Decedent's original designation. Lawrie and Norsworthy filed a joint answer and new matter to Landis' petition. The Decedent's estate also filed a separate answer and new matter.

Before the orphans' court, the parties presented evidence concerning the Decedent's mental capacity to make a knowing and conscious decision to add beneficiaries to her IRA. To show that his mother was mentally unfit on the last day of her life and to prove that the change of beneficiary form and accompanying video did not reflect the Decedent's intent, Landis focused on the fact that she was often forgetful or confused at relevant times. Moreover, Landis stressed that earlier in the year of her death, his mother had named

him the sole beneficiary of the IRA and her will, and that he and his mother remained close throughout her illness.

Lawrie and Norsworthy agreed that Landis and his mother had a strong relationship up until the day she died. Those parties and other witnesses also acknowledged that the Decedent was in extremely poor mental and physical condition on November 9 and 10, 2016. However, it was undisputed that the Decedent's condition improved to a surprising extent on November 11 due to a large dose of steroidal medication which reduced the swelling of her brain. Lawrie and Norsworthy emphasized that the Decedent was lucid, appearing more like herself than she had in many months. Both Landis and his wife also conceded at trial that they were surprised at how much the Decedent had seemed to recover.

Musselman testified that when he met with the Decedent to add beneficiaries to her IRA, she did so knowingly and consciously. Lawrie and Norsworthy introduced into evidence the video recording Musselman took of the Decedent on the day of her death. In that video, she directed Musselman to have Lawrie and Norsworthy added as primary beneficiaries of the IRA and she specified their respective shares:

> Ms. Nancy Landis: Take two. All right. This is Nancy Landis. [My birthday is] 1/20/59 for people who don't know that. I am talking about my IRA and I just want to clarify things in case there is any questions brought up later down the road.
>
> IRA I would like disbursed as follows: 20 percent to my son Jonathan; 50 percent to go to my sister [Lawrie]; and 30 percent to go to my son Jonathan –

Mr. Musselman: Jack [Norsworthy]?

Ms. Nancy Landis: I am sorry, Jack, to go to my boyfriend Jack.

Mr. Musselman: And of the money that's going to [Lawrie], is some of that supposed to go to your grandchildren?

Ms. Nancy Landis: That is, yes.

Mr. Musselman: And you had discussed that you would like to have out of that amount that goes to [Lawrie], the 50 percent, 10 percent each to each of the children.

Ms. Nancy Landis. To the grandchildren, yes.

Mr. Musselman: All right.

Ms. Nancy Landis: And then I will leave it – Should I put in there about Jack and his kids?

Mr. Musselman: Yes.

Ms. Nancy Landis: I will leave it up to Jack. I can't take care of his kids, but I want to do right by them also, because they are – I love them like they are my own. They are part of our family to me just like my own family. And I would leave it to Jack to whatever he would want to take from what he is getting to disburse amongst his children, if he wants to do that, and the amount would be left up to him. I just want to do something for them. But I can't do a whole lot financially, so the little bit that I can do would be helpful, I hope.

Trial Transcript, 9/17/2018, at pp. 50-52.

To rebut the claim that the change of beneficiary form did not further

the Decedent's intent, Lawrie and Musselman testified extensively about the

Decedent's concern that Landis had poor spending habits.[3] They recounted the Decedent's annoyance at Landis' multiple requests for her to gift him a vacation home, as well as Landis' charges on a credit card that was in her name.[4] Lawrie and Musselman testified that the Decedent wanted to reduce Landis' share in the IRA to ensure that his children (her grandchildren) would receive a portion of those funds.

After considering the evidence, the orphans' court denied Landis' petition. *See* Opinion and Order, 6/25/2019, at pp. 6-7. In its opinion, the orphans' court credited evidence that the Decedent had the required mental capacity to add beneficiaries to her IRA. *Id*. Conversely, the orphans' court found no credible evidence that the Decedent had been unduly influenced by anyone to designate Lawrie or Norsworthy as new IRA beneficiaries. *Id*. Landis then filed the instant appeal.[5]

_____

[3] Lawrie's daughter, Carol Jayne Miner, corroborated that the Decedent was bothered by Landis' spending habits and frequent vacations.

[4] Landis testified that the Decedent had no problem with his credit card charges and lifestyle. He testified that it was the Decedent's idea to gift him the vacation home in order to avoid estate taxes. However, the inter vivos transfer of that home never occurred.

[5] On review, we will defer to the findings of the trial court "unless there has been an abuse of discretion or a fundamental error in applying the correct principles of law." *In re Estate of Luongo*, 823 A.2d 942, 951 (Pa. Super. 2003). A judgment that is unreasonable, arbitrary, or capricious, or if it fails to apply the law or was motivated by partiality, prejudice, bias or ill will. *Harman v. Borah*, 756 A.2d 1116, 1123 (Pa. 2000). "If the record adequately supports the trial court's reasons and factual basis, the court did

## II.

## A.

Landis initially contends that the typed change of beneficiary form was invalid because it was not executed with sufficient formality. He argues that the form was defective because Musselman prepared and submitted the document after the Decedent had died, attaching a signature page that was originally appended to the destroyed or lost handwritten version. Landis also asserts that the form is invalid because it does not comport with the Decedent's intent to make Landis' children additional primary beneficiaries.

In a factually analogous case involving the last-minute change of an IRA beneficiary, **In re Estate of Golas**, 751 A.2d 229 (Pa. Super. 2000), we gave effect to a grantor's wishes even though he had not completed a change in beneficiary form prior to his death. Like the Decedent in the present case, the grantor in **Golas** sought to make changes to his IRA beneficiary designations in the midst of a fatal illness. He made several attempts to obtain the required forms, but succumbed to cancer before his financial advisor could supply them. **See Golas**, 751 A.2d at 230. The grantor made it clear that he wanted his estate to receive his IRA funds instead of his sister, who had been designated as the primary beneficiary. After the grantor died, the estate and

_____

not abuse its discretion." **Ambrogi v. Reber**, 932 A.2d 969, 974 (Pa. Super. 2007).

the grantor's sister litigated the matter before the orphans' court, where the estate prevailed. *Id.*

Despite that the grantor in *Golas* was never able to submit and execute any change of beneficiary form at all, we upheld the orphans' court's ruling that the decedent's IRA funds would go to his estate rather than to the original beneficiary. *Id*. at 231-32. Since the grantor intended that outcome but died before he could complete the necessary paperwork, the intended change was given effect. *Id*. at 233 ("The absence of any writing to indicate this particular change is of no moment under these circumstances."). In so holding, we adopted several equitable principles:

> In general, one must follow the requirements specified by the policy in order to validly change the beneficiary. However, the law in this Commonwealth is also clear that "[t]he intent of the insured will be given effect if he does all that he reasonably can under the circumstances to comply with the terms of the policy which permit a change of beneficiary." *Carruthers* [*v. $21,000*, 434 A.2d 125, 127 (Pa. Super. 1981)]. Most U.S. jurisdictions follow this equitable principle. We also note that the formal procedures which an insurance company requires in order to effect a change of beneficiary are in place to protect the company. Thus an original beneficiary is without the right to insist upon strict compliance with those requirements.

*Id*. at 231 (some citations and footnote omitted). We reasoned that the standards adopted in the context of an insurance policy are equally applicable in the context of a retirement plan, such as an IRA. *See id*. at 231 n.3.

In this case, Musselman, after completing a handwritten change of beneficiary form in the presence of the Decedent, submitted to Voya a typed version of that form. He attached to the typed version the signature page

from the handwritten version, which he claims was lost or destroyed. Musselman testified that the handwritten and typed versions listed the same beneficiaries and the same percentages. As we explained in **Golas**, a change of beneficiary form will be found valid if it ultimately achieves what the decedent, in fact, intended, and the decedent substantially complied with the applicable procedures by doing enough under the circumstances to carry out her intentions.

The typed change of beneficiary form memorialized the intent of the Decedent. The trial court credited Musselman's testimony that the information concerning beneficiaries on the typed form was the same as the handwritten iteration. As she stated in the video recording and as she instructed Musselman, the Decedent wanted to designate Lawrie and Norsworthy as IRA beneficiaries. The shares allotted to Landis, Lawrie and Norsworthy in the typed form match the apportionments the Decedent articulated in her video. Under the circumstances, the Decedent could not have done more to effectuate the changes that she intended to make regarding her IRA beneficiaries. **See Golas**, 751 A.2d at 233 ("It would be wholly fallacious to expect [the decedent] to have done any more than he did to accomplish the change [of IRA beneficiary], particularly in light of his rapidly deteriorating health.").

Moreover, the form Musselman executed remains valid even though it does not explicitly reflect the Decedent's intent to add her grandchildren as

beneficiaries. The Decedent had stated in her video that each of the grandchildren was to receive 10% each of the IRA proceeds, to be taken out of the 50% share allotted to Lawrie. At the proceedings in this matter, Lawrie promised to abide by the Decedent's wishes, conditioning her receipt of a 50% share on the understanding that the majority of that amount would go to the grandchildren as the Decedent directed. *See* Trial Transcript, 9/18/2018, at pp. 58-59.

Even though Lawrie was named as a beneficiary for purposes of receiving an IRA distribution, the Decedent's video statement also made Lawrie a trustee of the portion of the IRA intended for the three grandchildren, precluding her from using those funds for her own personal benefit. *See* ***Nagle v. Nagle***, 799 A.2d 812, 819 (Pa. Super. 2002) ("A constructive trust arises when a person holding title to property is subject to an equitable duty to convey it to another on the ground he would be unjustly enriched if he were permitted to retain it.").[6] Accordingly, a constructive trust was established for the benefit of Landis' children, as any IRA distribution should so reflect.

_____

[6] To clarify, the Decedent's three grandchildren are each to receive 10% of the *entire* IRA, not just a tenth of Lawrie's 50% share. For example, if the entire IRA were now worth its previous value of $600,000, then each grandchild would receive $60,000. Lawrie's 50% share would actually be worth 20% of the total IRA, or $120,000. This distribution corresponds to the Decedent's video, as well as to Landis' unrebutted testimony that Musselman informed him on November 11, 2016, that each of his children would receive about $60,000 pursuant to the executed form. *See* Trial Transcript, 9/17/2018, at p. 183.

Thus, because Decedent's intent was clear on how her IRA funds were to be distributed, and the Decedent did all she could to change her beneficiary designations, the subject form was valid.

**B.**

Landis next contends that even if the change of beneficiary was validly executed, the orphans' court abused its discretion in finding that there was no clear and convincing evidence that the change of his beneficiary status resulted from undue influence.

"[U]ndue influence is a 'subtle,' 'intangible' and 'illusive' thing,'" making it difficult to prove. *In re Estate of Clark*, 334 A.2d 628, 635 (Pa. 1975). It is "generally accomplished by a gradual, progressive inculcation of a receptive mind." *Id*. at 634. A presumption of undue influence arises when it is demonstrated by clear and convincing evidence: (1) that a person or persons in a confidential relationship with a grantor has (2) received a substantial portion of the grantor's property, and (3) that the grantor suffers from a weakened intellect. *See In re Estate of Glover*, 669 A.2d 1011, 1015 (Pa. Super. 1996). If the presumption applies, then the burden of proof shifts to the defendant to disprove by clear and convincing evidence at least one of the elements of undue influence. *See Clark*, 334 A.2d at 632.

While both Lawrie and Norsworthy admit they received a substantial benefit from the disputed change of beneficiaries, they contested the

- 13 -

"confidential relationship" and "weakened intellect" elements of undue influence. Each of these contested elements will be discussed below in turn.

First, a confidential relationship "exists whenever circumstances make it certain that the parties did not deal on equal terms but that on the one side there was an overmastering influence, and on the other, dependence or trust, justifiably reposed." *Matter of Estate of Ross*, 462 A.2d 780, 783 (Pa. Super. 1983). Such conduct must "consist of imprisonment of the body or mind, fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery or physical or moral coercion, to such a degree as to prejudice the mind of the [grantor], to destroy his free agency and to operate as a present restraint upon him in the making of a [bequest]." *In re Estate of Angle*, 777 A.2d 114, 123 (Pa. Super. 2001) (quoting *In re Estate of Ziel*, 359 A.2d 728, 733 (Pa. 1976)).

There is no evidence in the record that suggests the Decedent had this type of relationship with Lawrie, Norsworthy or any other party. As a result, we can find no error in the orphans' court's finding that the Decedent was at the time of her death "a strong-willed, determined person who was not easily susceptible to advice or guidance that was contrary to her interests." Order and Opinion, 6/25/2019, at p. 5.

As for the weakened intellect element, there is no "bright-line test by which [it] can be identified to a legal certainty, [but cases] have recognized that it is typically accompanied by persistent confusion, forgetfulness and

- 14 -

disorientation." ***Owens v. Mazzei***, 847 A.2d 700, 707 (Pa. Super. 2004). These factors are especially significant in the context of spoken words and conduct at the time a disputed document is executed. ***See In re Myers' Estate***, 150 A.2d 525, 528-29 (Pa. 1959).[7]

In this case, the orphans' court heard conflicting evidence regarding the Decedent's state of mind at the time she made changes to her IRA beneficiary designations. Landis contends that he offered clear and convincing evidence that the Decedent was incapable of making a knowing and conscious decision to add beneficiaries to her IRA. He points out that she struggled with severe physical and cognitive limitations after her brain surgery and in the days preceding her death. By all accounts, she was often forgetful during that period of her illness and nearly comatose just a day before reducing Landis' share. Landis also showed that he always maintained a strong bond with his mother, and in the months preceding her death, she had planned for him to

---

[7] On appeal, an orphan's court's findings as to a decedent's capacity must be afforded a high degree of deference:

> The Orphans' Court's mandate in assessing such evidence is relatively broad. If the court's decision rests upon legally competent and sufficient evidence, we will not revisit its conclusions. Under no circumstance will we substitute our judgment of credibility for that of the Orphans' Court.

***Owens v. Mazzei***, 847 A.2d 700, 707 (Pa. Super. 2004) (citation omitted).

be the sole beneficiary of her IRA funds. Landis remained the sole heir of her estate.

However, numerous witnesses testified that the Decedent was lucid on the last day of her life. Significantly, months preceding her death and incapacity on November 9 and 10, 2016, the Decedent, on August 31, 2016, had Landis removed as a beneficiary of her pension and a life insurance policy. This evidences the Decedent's general intent to reduce the amount of her non-probate funds going to Landis.

A number of witnesses also testified that on the date of her death. November 11, 2016, the Decedent was fully alert and aware of her surroundings. The attending oncologist noted that her behavior, speech and judgment had appeared "normal." **See** Deposition of Dr. Tara Morrison, M.D., 5/23/2018, at p. 120.

Moreover, through the video taken by Musselman, the orphan's court had the opportunity to view the Decedent's speech and demeanor at the very moment she directed the subject changes to her IRA beneficiary designations. The trial court believed the Decedent to be at the time of the form's execution "aware of the value of her IRA and . . . firm in her desired disposition of the IRA assets upon her death." **Id**. at 6. The orphans' court accepted this evidence in finding that Decedent had the capacity to make Lawrie and

Norsworthy beneficiaries of her IRA and to reduce Landis' share. **See** Order and Opinion, 6/25/2019, at pp. 6-7.[8]

The orphans' court's findings are supported by competent substantial evidence. Accordingly, because the orphans' court did not abuse its discretion in finding that the change of beneficiary form was valid, and that Landis failed to prove the Decedent was subject to undue influence when making changes to her IRA beneficiary designations, the order on review must be affirmed.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/23/2020

---

[8] In addition to Lawrie and Norsworthy, Landis argues in his brief that the executed form resulted from the undue influence of Musselman. However, the record reflects that Musselman's alleged undue influence was never litigated in the orphans' court. Nor did Landis raise the undue influence of Musselman as an issue in his 1925(b) statement, precluding our consideration of that issue on appeal. **See** Pa.R.A.P. 1925(b)(4)(vii). Even if Landis could raise Musselman's undue influence as an appellate issue, it would lack merit because of the above-discussed lack of clear and convincing evidence regarding the Decedent's weakened intellect.