J-A04010-19

2019 PA Super 334

| | | |
|---|---|---|
| ESTATE OF: STELLA FABIAN, DECEASED | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: LOUISE BENSON, SUSANNE SULLIVAN, GREGORY FABIAN, MICHELLE KRATZER AND JENNIFER SLADE | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2804 EDA 2018 |

Appeal from the Decree Entered June 28, 2018
In the Court of Common Pleas of Carbon County Orphans' Court at
No(s):  16-9051

BEFORE:  LAZARUS, J., KUNSELMAN, J., and COLINS, J.*

OPINION BY LAZARUS, J.:                    **FILED NOVEMBER 7, 2019**

Louise Benson, Susanne Sullivan, Gregory Fabian, Michelle Kratzer and Jennifer Slade (collectively, "Contestants") appeal from the decree, entered in the Orphans' Court Division of the Court of Common Pleas of Carbon County, denying their appeal from probate of the Last Will and Testament of Stella Fabian, Deceased ("Testatrix").  Upon careful review, we vacate and remand with instructions.

Testatrix died on January 31, 2016.  Her husband predeceased her, as did her daughter, Barbara Fabian, with whom she was very close and had resided for several decades.  Testatrix left a will dated June 20, 2014, in which she left the entirety of her estate to her nieces, Carolyn J. Kutta and Marie T. Krepicz, and her nephews, Robert A. Treskot and Charles R. Treskot (collectively, "Proponents"), in equal shares.  Testatrix appointed Marie and Charles as co-executors.  The 2014 will superseded a prior will, dated

_____
*Retired Senior Judge assigned to the Superior Court.

December 29, 1988, in which Testatrix left her entire estate to Barbara and, in the event Barbara predeceased her, to the following individuals: Robert Treskot, 10%; Carolyn Treskot Kutta, 5%; Marie Krepics [sic], 10%; Susan [sic] Fabian (now Sullivan) (great-niece), 10%; Michelle Fabian (now Kratzer) (great-niece), 5%; Jennifer Fabian (now Slade) (great-niece), 10%; Louise Fabian (now Benson) (niece-in-law), 10%; Gregory Fabian (nephew), 5%; the children of Katherine Kralik, 25%; Mary Redline (niece), 5%; and Sacred Heart Church, 5%. **See** Will of Stella Fabian, 12/29/88, at Item Third.

The 2014 will was admitted to probate on February 16, 2016, and letters testamentary were granted to Marie and Charles. On May 27, 2017, Contestants filed a "Petition for Citation to Show Cause Why Appeal from Probate Should Not Be Granted and Certain Writing Offered as Will Vacated." In their petition, Contestants alleged that: Testatrix's 2014 will was the product of undue influence exercised upon Testatrix by Marie and Charles; Testatrix lacked capacity to execute a valid will; the will was the product of fraud exercised upon Testatrix by Marie; and the will was the product of a mistake on the part of Testatrix and did not represent her true testamentary intent. **See** Petition for Citation, 5/27/17.

Proponents filed a response to the petition on July 7, 2016. Hearings were held on January 18, 2107, April 20, 2017, and July 21, 2017. By decision and decree issued on June 28, 2017, the court denied Contestants' appeal

from probate. This timely appeal follows, in which Contestants raise the following issues for our review:[1]

> 1. Did the Orphans' Court err by ruling that Georgia Young, RN, was not qualified to offer an expert opinion on mental capacity despite her special training and ten years of experience making such assessments?
>
> 2. Did the Orphans' Court err as a matter of law by concluding that Testatrix did not suffer from a weakened intellect where: (a) the court found that she could not conduct her own affairs; (b) there was evidence that Testatrix was cognitively impaired with moderate Alzheimer's disease and could not make her own decisions; (c) the Proponents provided the scrivener with the proposed terms of the will; and (d) the court's findings of fact mischaracterized the testimony of key witnesses?
>
> 3. Did the Orphans' Court err by not finding that Proponents had failed to rebut the presumption of undue influence, where Proponents presented no expert witnesses and testified that they were heavily involved in procuring the will and that Testatrix was easily influenced?

*See* Brief of Appellants, at 5-6.

Contestants first assert that the Orphans' Court erred in refusing to qualify Nurse Young as an expert on mental capacity. Our standard of review of a trial court's decision to exclude expert testimony is very narrow.

> The admission or exclusion of evidence, including the admission of testimony from an expert witness, is within the sound discretion of the trial court. . . . [W]e may only reverse upon a showing that the trial court clearly abused its discretion or committed an error of law. To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

---

[1] We have rephrased and/or combined the issues raised in Contestants' statement of questions involved for clarity and ease of disposition.

*McClain ex rel. Thomas v. Welker*, 761 A.2d 155, 156 (Pa. Super. 2000), quoting *Turney Media Fuel, Inc. v. Toll Bros., Inc.*, 725 A.2d 836, 839 (Pa. Super. 1999). The standard for qualification of an expert witness is a liberal one. "The test to be applied when qualifying an expert witness is whether the witness has *any* reasonable pretension to specialized knowledge on the subject under investigation." *Miller v. Brass Rail Tavern, Inc.*, 664 A.2d 525, 528 (Pa. 1995) (emphasis in original). It is not a necessary prerequisite that the expert be possessed of all of the knowledge in a given field, only that he possess more knowledge than is otherwise within the ordinary range of training, knowledge, intelligence or experience. *Id.*

Here, the Contestants offered Nurse Young as an expert with respect to mental capacity and the cognitive abilities of patients suffering from Alzheimer's disease and dementia. Nurse Young testified that she was a registered nurse employed as the director of nursing at Maple Shade Meadows, the personal care home where Testatrix resided. She had held that position for approximately four years. Nurse Young stated that her job was to oversee the care of all residents, screen potential residents, perform monthly assessments on all residents, and perform admissions and discharges. She testified that her assessments encompassed cognitive and mental function, but that she had no special certifications related to patients with Alzheimer's disease or dementia. However, Nurse Young testified that for a period of ten years, until October 2016, she held a certification as a

psychiatric mental health nurse from the American Nurses Credential Center, which included course work in Alzheimer's and dementia.

Proponents objected to the qualification of Nurse Young as an expert in dementia, Alzheimer's disease and mental capacity on the basis that she lacked specialized knowledge, training or certification in those areas. Proponents also objected based on her failure to submit an expert report. The court agreed, recognizing Nurse Young as an expert in the general field of nursing, but declining to qualify her as an expert in competency determinations. In doing so, the court reasoned:

> Nurse Young testified that she is a graduate nurse from a diploma program, but that she does not have a bachelor's degree. She does not have any specialized certifications related to the care of patients with Alzheimer's or dementia. Additionally, Nurse Young has never before been qualified as an expert witness by any court and has not published any papers regarding patients with Alzheimer's or dementia. She did not prepare an expert report related to her testimony in the instant matter.

Trial Court Opinion, 10/2/18, at 12.

On appeal, Contestants argue that "Pennsylvania law does not require that an expert witness have any specific college degree or type of experience, or that the witness have authored articles on the relevant subject area." Brief of Appellants, at 20. Rather, Contestants claim, an expert witness need only possess "more knowledge on the relevant subject area than the average layperson." *Id.* Contestants assert that Proponents did not argue that Nurse Young's testimony would not be helpful to the finder of fact and, further, that she was not required to prepare an expert report, citing Pa.R.C.P. 4003.5

(authorizing disclosure of anticipated expert testimony through responses to interrogatories). Contestants assert that they were "severely prejudiced" by their inability to offer the expert testimony of "the person who saw, interacted with, assessed, and managed the care of the decedent *on a daily basis*." Brief of Appellant, at 22 (emphasis in original). Contestants claim that Nurse Young's testimony "would have concurred with Dr. [John] Bosi's assessment that the [Testatrix's] cognitive abilities were severely impaired, and she did not possess the cognitive abilities to understand an important legal document such as a will." ***Id.***

We agree with Contestants that the Orphans' Court erred in its refusal to qualify Nurse Young as an expert witness. As noted above, the test to be applied when qualifying an expert witness is whether the witness has "*any reasonable pretension to specialized knowledge on the subject under investigation.*" ***Miller***, 664 A.2d at 528 (emphasis in original). If she does, she may testify and the weight to be given to such testimony is for the trier of fact to determine. ***Id.*** Here, Nurse Young clearly possessed "specialized knowledge [regarding the treatment of the cognitively impaired] which would not otherwise be known to a lay individual." ***Id.*** at 529. Nurse Young was a registered nurse and the director of nursing at a facility in which at least three quarters of the patients suffered from Alzheimer's disease. ***See*** N.T. Trial, 1/18/17, at 131. In that capacity, Nurse Young's responsibilities included conducting ongoing cognitive assessments of the residents, preparing resident care plans, and monitoring residents' medications. ***Id.*** at 132. In addition to

her professional experience, Nurse Young held, until October 2016, a certification in psychiatric and mental health nursing, which required the completion of coursework in Alzheimer's and dementia. *Id.* at 137.

A witness does not need formal education on the subject matter of the testimony, and may be qualified to render an expert opinion based on training and experience. *Miller*, 664 A.2d at 528. Nevertheless, the court based its decision not to qualify Nurse Young as an expert solely upon the facts that she lacked a bachelor's degree, had never published any papers regarding Alzheimer's or dementia, and had never before been qualified as an expert witness. *See* Trial Court Opinion, 10/2/18, at 12. None of these factors is a prerequisite to the qualification of an expert witness. As such, the court's reliance on Nurse Young's lack of formal qualifications was impermissible, and we hold that the court's refusal to qualify Nurse Young as an expert in the care of Alzheimer's and dementia patients, therefore, was an abuse of discretion. However, our inquiry does not end here; to constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party. *See McClain*, *supra*. We conclude that it was not.

First, by Contestants' own admission, Nurse Young's expert testimony would have been merely cumulative of the testimony offered by Dr. Bosi, the physician at Maple Shade Meadows care home who evaluated Testatrix upon her admission to the facility on April 16, 2014, and continued to treat her until her death. Specifically, Dr. Bosi testified that Testatrix suffered from

moderate to severe Alzheimer's disease, *see* N.T. Trial, 1/18/17, at 28; that she was not capable of making her own medical or financial decisions, *see id.* at 28-29; that her condition deteriorated from the time she was admitted to Maple Shade Meadows, *see id.* at 30; that she would not have understood the nature of her assets and the possible objects of her bounty, *see id.* at 31; and that she lacked the capacity to execute a will after April 16, 2014. *See id.* These are the same facts that Contestants sought to elicit from Nurse Young.

Moreover, Nurse Young was, in fact, allowed to testify as an expert in nursing. During the course of her testimony, Contestants elicited substantial evidence regarding Testatrix's cognitive impairment, including her poor performance on multiple mini-mental-status exams and her need for assistance with laundry, shopping, transportation, managing finances, using the telephone, making and keeping appointments, care for personal possessions and writing correspondence. Given the earlier testimony of Dr. Bosi, as well as evidence gleaned from Nurse Young's testimony, we cannot conclude that Contestants were prejudiced by the court's failure to qualify Nurse Young as an expert in Alzheimer's and dementia. Accordingly, Contestants are not entitled to a new trial for this reason. *See Soda v. Baird*, 600 A.2d 1274, 1277 (Pa. Super. 1991) (no basis for reversal and new trial if excluded evidence cumulative in nature).

Contestants next assert that the Orphan's Court erred in failing to find that Testatrix's will was the product of undue influence, "despite clear and convincing evidence, and its own factual findings," that she suffered from a weakened intellect. Brief of Appellants, at 23. Contestants assert that the Orphans' Court applied the incorrect legal standard by focusing its analysis on the date of execution, rather than the time period leading up to the date of execution, and assert that the court placed improper emphasis on the testimony of the scrivener, arguing that "[t]he testimony of [the scrivener] and his employees that [Testatrix] understood what she was doing on the day she signed the [w]ill has little relevance to determining whether she suffered from a 'weakened mental intellect,'" rendering her susceptible to the influence of Proponents. Brief of Appellants, at 36-37. Contestants note that it was Proponents who arranged for the scrivener to meet Testatrix to draft a new will and provided him with a draft of proposed beneficiaries. They argue that, "[w]hile some individuals who suffer from Alzheimer's disease and dementia may continue to retain some control over their lives, no evidence was presented that [Testatrix] continued to assert her independence or decision-making rights" in the weeks leading up to the will's execution. *Id.* at 37-38.

We begin by noting the following:

> In a will contest, the hearing judge determines the credibility of witnesses. The record is to be reviewed in the light most favorable to appellee, and review is to be limited to determining whether the trial court's findings of fact were based upon legally competent and sufficient evidence and whether there was an error of law or abuse of discretion.

*Estate of Reichel*, 400 A.2d 1268, 1269–70 (Pa. 1979).

> "The resolution of a question as to the existence of undue influence is inextricably linked to the assignment of the burden of proof." *In re Estate of Clark*, [] 334 A.2d 628, 632 ([Pa.] 1975). Once the proponent of the will in question establishes the proper execution of the will,[2] a presumption of lack of undue influence arises; thereafter, the risk of non-persuasion and the burden of coming forward with evidence of undue influence shift to the contestant. *Id.* The contestant must then establish, by clear and convincing evidence, a *prima facie* showing of undue influence by demonstrating that: (1) the testator suffered from a weakened intellect; (2) the testator was in a confidential relationship with the proponent of the will; and (3) the proponent receives a substantial benefit from the will in question. *Id.* Once the contestant has established each prong of this tripartite test, the burden shifts again to the proponent to produce clear and convincing evidence which affirmatively demonstrates the absence of undue influence. *Id.*

*In re Estate of Smaling*, 80 A.3d 485, 493 (Pa. Super. 2013).

Here, Contestants challenge the court's finding that Testatrix did not suffer from a weakened intellect.[3] The weakened intellect necessary to establish undue influence need not amount to testamentary incapacity. *Clark*, 334 A.2d at 634. "Although our cases have not established a bright-line test by which weakened intellect can be identified to a legal certainty, they have recognized that it is typically accompanied by persistent confusion, forgetfulness and disorientation." *In re Estate of Fritts*, 906 A.2d 601, 607

---

[2] Here, the parties stipulated to the execution of the will.

[3] Neither party has challenged the Orphans' Court's conclusions that there existed a confidential relationship between Testatrix and Proponents or that Proponents receive a substantial benefit under the will. Accordingly, the court's rulings on those issues are not before us.

(Pa. Super. 2006). Moreover, because undue influence is generally accomplished by a gradual, progressive inculcation of a receptive mind, the "fruits" of the undue influence may not appear until long after the weakened intellect has been played upon. **Clark**, 334 A.2d at 634. Accordingly, *the particular mental condition of the testator on the date he executed the will is not as significant when reflecting upon undue influence as it is when reflecting upon testamentary capacity*. **Id.** More credence may be given to remote mental history. **Id.**

We begin by addressing Contestants' assertion that the Orphans' Court applied the incorrect legal standard in reaching its conclusion that Testatrix did not suffer from a weakened intellect. In the conclusions of law contained in its Decision issued on June 28, 2018, the Orphans' Court discounted the testimony of Dr. Bosi and Nurse Young regarding Testatrix's history of Alzheimer's and dementia. Instead, the court relied on the testimony of the scrivener of the will, Michael Greek, Esquire, and his two employees who were present with him at the time Testatrix executed her will. In doing so, the court concluded that Testatrix did not suffer from a weakened intellect because she was "quite lucid at the time she executed the contested will." Orphans' Court Decision, 6/28/18, at 15. This was clearly a misapplication of the law. **Clark**, **supra** (mental condition of testator on date of execution not as significant when reflecting upon undue influence as when reflecting upon testamentary capacity).

In its subsequent Pa.R.A.P. 1925(a) opinion, the court purported to remedy its error by stating the following in a footnote:

> It should be noted that, while this [c]ourt stated in our decision and decree of June 28, 2018, that "Petitioners have failed to demonstrate by clear and convincing evidence that, when the will was executed, [Testatrix] was of weakened intellect[,]" the language "when the will was executed" was a direct reference to the standard for a claim of testamentary incapacity. However, when viewing the evidence to make the determination of whether [Testatrix] was of a weakened intellect for the purposes of the undue influence claim, this [c]ourt viewed all available evidence, not only that which related to the events of June 20, 2014. Thus, the language "when the will was executed" was used to emphasize the testamentary incapacity legal standard, not to foreclose this [c]ourt from considering evidence prior to the date of execution in determining whether [Testatrix] suffered from a weakened intellect.

Orphans' Court Opinion, 10/2/18, at 9-10 n.2 (internal citations omitted).

Nevertheless, in the body of its opinion, the court continued to place almost exclusive emphasis on the testimony of Attorney Greek, who met Testatrix twice:  on June 13, 2014, and on the date of execution, June 20, 2014.  The court focused on the Testatrix's ability to identify family members and express herself and her testamentary wishes.  The court stated that "[i]f Attorney Greek had suspected [Testatrix] was subject to undue influence, he would have stopped the will consultation process."  *Id.* at 7.  However, the court misses the point.  As noted above, because undue influence is generally accomplished by a "gradual, progressive inculcation of a receptive mind," the "fruits" of the undue influence may not appear until long after the weakened intellect has been played upon.  *Clark*, 334 A.2d at 634.  Thus, Attorney

- 12 -

Greek—a stranger to the Testatrix—could have had no way of knowing whether, in the weeks and months prior to his two meetings with Testatrix, her mental state could have rendered her susceptible to the undue influence of third parties. Once again, evidence of Testatrix's mental state at the time of execution is of substantially less probative value to an undue influence inquiry than it is to a determination of testamentary capacity. As both Dr. Bosi and Nurse Young testified, patients with Alzheimer's dementia can have "good days" and "bad days."

> [Nurse Young:] Someone may be totally alert and oriented and pretty sharp and then two hours later, they won't cooperate with you for anything. That's the way dementia works. It's not predictable. We can't say; well, you know, she did this on this day, why can't she do that everyday? That's the way the disease runs its course.

N.T. Trial, 1/18/17, at 176. "[T]he scrivener of a will, especially if a lawyer, is always an important and usually the most important witness in a contested will case, and, *where the lawyer knew the testator prior to the execution of her will*, his testimony showing voluntary and intelligent action by the testator makes out a *prima facie* case that requires very strong evidence to offset it." ***In re Mampe***, 932 A.2d 954, 961 (Pa. Super. 2007) (emphasis added). Here, however, where Attorney Greek had never met Testatrix until seven days before she executed her will, this principle is inapplicable. ***See id.*** (testimony regarding testatrix's voluntary and intelligent actions by scrivener unfamiliar with testatrix not dispositive of question of testatrix's weakened intellect).

In light of the Orphans' Court's clear failure to apply the correct standard to its weakened intellect analysis, we review the evidence presented in light of the correct standard. Our review of the evidentiary record constrains us to conclude that the court erred in failing to find that Testatrix suffered from a weakened intellect in the period leading up to the execution of her will. The disinterested testimony regarding Testatrix's cognitive state during the relevant time period demonstrates, by clear and convincing evidence, that Testatrix suffered from a weakened intellect in the period leading up to the execution of the June 20, 2014 will.

In addition, the Orphans' Court found that Contestants established the remaining prongs necessary to establish a presumption of undue influence, i.e., they proved (1) the testator was in a confidential relationship with Proponents, who (2) receive a substantial benefit under the will. *See Smaling*, *supra*. Neither party challenged those determinations on appeal. Accordingly, as Contestants established the presumption that Proponents exercised undue influence on the Testatrix, the burden shifts Proponents to demonstrate the absence of undue influence by clear and convincing evidence. *Clark*, *supra*; *Smaling*, *supra*. We, therefore, reverse and remand for a determination by the Orphans' Court as to whether Proponents established, by clear and convincing evidence, the absence of undue influence.

Order vacated. Case remanded with instructions. Jurisdiction relinquished.

Judge Kunselman joins this Opinion.

- 14 -

Judge Colins concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>11/7/19</u>