J-S30031-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN RE: ESTATE OF EARL PHILLIP MURRAY, DECEASED | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: TERESA E. WARNER AND JEAN LEONA UPDYKE | : : : : : : | No. 2 WDA 2020 |

Appeal from the Decree Entered November 15, 2019
In the Court of Common Pleas of Somerset County Orphans' Court at
No(s):  File No. 65 Estate 2013

BEFORE:   MURRAY, J., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    FILED JULY 30, 2020

Teresa E. Warner ("Teresa") and Jean Leona Updyke ("Jean") (collectively "Contestants") appeal from the November 15, 2019, Decree entered in the Court of Common Pleas of Somerset County, Orphans' Court Division, dismissing the appeal of Contestants from the Decree of the Register of Wills admitting to probate the December 22, 2012, will of Earl Phillip Murray ("the Testator").  After a careful review, we affirm.

The relevant facts and procedural history are as follows: The Testator and his wife, Anna Murray ("Anna"), (collectively "the Murrays") lived in Conemaugh Township, Somerset County, Pennsylvania.  They had no children. On February 9, 2012, the Testator executed a Last Will and Testament

_____

[*] Former Justice specially assigned to the Superior Court.

providing, inter alia, that, in the event Anna predeceased him, his niece, Jean, was to receive a cash legacy of $10,000.00, while his niece, Teresa, was to receive the remainder of his estate.

On October 9, 2012, Anna died. On December 22, 2012, the Testator executed a Last Will and Testament, which specifically revoked his February 9, 2012, will, and appointed his niece, Catherine A. Marshall ("Cathy"), the executrix of his estate. The will made relatively small bequests to Jean and Teresa, as well as another one of the Testator's nieces, Linda Balon ("Linda"), and left the remainder of the estate to Cathy. The Testator died on January 15, 2013.

On February 5, 2013, Cathy filed with the Register of Wills the Testator's death certificate, his December 22, 2012, will, the Oath of Subscribing Witnesses, and the Petition to Grant Letters Testamentary. That same day, the Register of Wills admitted the will to probate and issued the Letters of Testamentary to Cathy as the executrix.

On February 28, 2013, Contestants filed an appeal from the Register of Wills' admitting the will to probate and issuing of Letters of Testamentary to Cathy. Specifically, they averred the December 22, 2012, will was invalid since, at the time it was executed, the Testator lacked testamentary capacity and/or he suffered from undue influence from Cathy.

The matter proceeded to a non-jury trial at which the parties agreed to a joint stipulation of facts, several joint exhibits, and the admittance of

depositions by the Testator's primary care physician, Dr. Jeanne Spencer, and two subscribing witnesses to the December 22, 2012, will, Susan Holsopple, LPN, and Lori Shank, LPN.[1] Additionally, seven witnesses testified during the trial.[2] The Orphans' Court has summarized the relevant evidence offered in this matter as follows:

> During their marriage, [the Murrays] were inseparable and shared a passion for collecting and selling antiques. While the Murrays did not have children of their own, they raised several extended family members, including Anna's nieces: Cathy Marshall, Teresa Warner, and Linda Balon, who are sisters. After Anna's nieces reached adulthood and moved out of the Murray residence, they remained in the Murrays' lives to differing degrees over time.
>
> Linda Balon moved out of the Murrays' home when she was about 16 years old, and later she married and moved to Florida. However, in 1979, Linda divorced, moved back to Conemaugh Township, and regained contact with the Murrays, visiting their residence on a weekly basis. In the late 1990s, Linda began frequenting the Murray residence on a daily basis. Together, Linda and the Murrays would go antiquing and spend time with Linda's children.
>
> In 2005, both [the Testator's] and Anna's physical health began to decline, and Linda transitioned into a caregiving role. Specifically, she would assist the Murrays with household maintenance and finances, in addition to taking the Murrays to

_____

[1] As the Orphans' Court noted, the parties stipulated that the court was to review and consider the depositions as if the deposed had personally appeared and testified before the court. Orphans' Court Opinion, filed 1/29/20, at 9 n.2.

[2] Specifically, Lieutenant James McKnight, Debra Heider (Jean's daughter), Randolph Updyke (Jean's son), Linda Balon (the sister of Cathy and Teresa), Gregory Dadura (the brother of Cathy and Teresa), and Sara Maines-Gilpatrick (who provided the Murrays with care from September to October of 2012) testified. See Orphans' Court Opinion, filed 1/29/20, at 9-10. Additionally, Teresa offered her own testimony. See id.

medical appointments. Over the next five years, [the Testator] frequented the hospital for physical ailments, but he was psychologically healthy. Linda played a critical role in assisting [the Testator] and Anna as the effects of old age set in. [The Testator] appreciated Linda's assistance so much that he desired to leave Linda his entire estate.

Linda continued assisting the Murrays on a daily basis until November of 2011. Around that time, Anna was diagnosed with cancer, causing [the Testator's] demeanor to change. [The Testator] could not cope with the fact that his wife was not well and directed his frustrations at Linda. On two occasions, he became so frustrated with Linda that he struck her, knocking her to the ground. Consequently, Linda ceased her daily visitations to the Murray residence. However, because she still cared deeply for Anna's well-being, Linda asked her sister, Teresa Warner, to begin helping the Murrays.

Like Linda, Teresa lived in the Murray residence until she was about 16 year's [sic] old and maintained contact with the Murrays after she moved out. However, Teresa's contact with the Murrays was less extensive than Linda's contact and did not involve caretaking. Nevertheless, when Linda asked Teresa to replace her as [the Testator's] and Anna's caretaker, Teresa agreed. Linda informed Anna that she would no longer be assisting the Murrays and that Teresa would take her place. Thereafter, Teresa [] began visiting the Murrays more frequently and assuming a caretaker role. Additionally, Teresa asked [the Testator's] niece, Jean Updyke, to assist her in providing the Murrays with care. Teresa and Jean cleaned the Murrays' home, brought them food, handled the Murrays' finances, accompanied them to doctor's appointments, and administered their medications.

On February 9, 2012, [the Testator] executed a Last Will and Testament providing that his entire estate was to be distributed to his wife, Anna Murray, and if she predeceased him, then his niece, Jean Updyke, was to receive a $10,000 cash legacy and Anna's niece, Teresa Warner, was to receive the rest, residue, and remainder of the estate. [The Testator] explained to Teresa that he no longer wished to bequeath Linda a portion of the estate because she ceased providing the Murrays' care, and, because Teresa replaced Linda, he now wanted her to receive the bulk of his estate.

In the early summer of 2012, the Murrays' health worsened. At this point, both [the Testator] and Anna had difficulty completing daily life activities. By August of 2012, Anna's stomach started to swell up, and Teresa took Anna to her doctor to have it examined. The doctor determined that Anna's cancer caused fluid to accumulate in her stomach region and that Anna would need to undergo frequent paracentesis to remove the fluid. As Anna's condition worsened, [the Testator] became increasingly cantankerous.

On September 5, 2012, [the Testator], Anna, Jean, and Teresa were at the Murray [r]esidence when [the Testator] became paranoid that Teresa was stealing some of the antiques from his home. Because she knew of [the Testator's] history of violent behavior, Teresa was afraid that [the Testator] might have tried to hurt her. Consequently, Teresa called [the Testator's] and Anna's primary-care physician, Dr. Jeanne Spencer, seeking aid. Dr. Spencer asked crisis management to evaluate [the Testator] at his residence. Upon Dr. Spencer's request, Bedford-Somerset MH/MR went to the Murray [r]esidence to conduct an initial commitment evaluation and determine whether a physician needed to further evaluate [the Testator] at the Conemaugh Hospital. [The Testator] was then transported to Conemaugh Hospital for further evaluation, and because the evaluation doctor determined the situation did not warrant involuntary admission, [the Testator] returned home.

Approximately two hours later, Lieutenant James McKnight of the Conemaugh Township Police Department was called to respond to another incident at the Murray [r]esidence. When he arrived, the Murrays, along with Rick and Teresa Warner,[3] were at the home. Lieutenant McKnight witnessed [the Testator] lying on the floor of his home with cuts on his hands. Lieutenant McKnight asked [the Testator] what had happened, and [the Testator] explained that he was trying to remove Rick and Teresa Warner from his home. [The Testator] was taken to Somerset Hospital, and his doctors then sent him to an eldercare facility, Atrium Manor.

Teresa and Linda's other sister, Cathy Marshall, discovered that [the Testator] was at Atrium Manor and went to visit him. During her visit, [the Testator] informed Cathy that he did not want to be there. [The Testator] was extremely upset that he was

_____

[3] Rick is Teresa's husband.

at Atrium [Manor] and blamed his situation on Teresa. Teresa believed that Atrium [Manor] was the best place for [the Testator] to be. However, [the Testator] knew that Anna was nearing death, and he wanted nothing more than to be with her during her final days. Consequently, [the Testator] viewed Teresa's efforts to commit him as an attempt to keep him away from his beloved wife. Thus, [the Testator] sought Cathy's assistance in returning him to his home.

On September 15, 2012, Anna[,] along with sisters Linda Balon, Teresa Warner, and Cathy Marshall[,] conducted a meeting at the Murray residence regarding whether [the Testator] should return home. Consistently with [the Testator's] most palpable wishes, Cathy advocated for [the Testator] returning home with Anna. Teresa advocated for [the Testator's] commitment at Atrium Manor. Cathy became frustrated with Teresa during the meeting and left the Murrays' home. Immediately after Cathy left, Teresa called a notary, Eleanor Zuccolotto, to secure a power of attorney over Anna in Teresa's favor with Linda designated as the alternate.

Around September 15, 2012, [the Testator] became confused and delirious while he was at Atrium Manor. Consequently, the staff at Atrium Manor decided to send [the Testator] to Conemaugh Hospital. After he was sent to Conemaugh Hospital, Cathy called [the Testator's] and Anna's physician, Dr. Spencer, inquiring about the Murrays' health, but Dr. Spencer denied the request because she was not familiar with Cathy and [the Testator] was not cognizant enough to instruct her how to proceed. [The Testator] regained his psychological well-being shortly after being admitted. Dr. Spencer found [the Testator's] recovery remarkable. She concluded that he likely suffered a brief psychological break because he was separated from his dying wife. After [the Testator] regained full cognizance, Dr. Spencer and [the Testator] discussed his future treatment options and whether the doctor could share information with Cathy. [The Testator] told the doctor that he wanted Cathy to have access to his medical information because Cathy wanted to return [the Testator] to his home, and, consequently, [the Testator] felt Cathy would act in his best interest.

On September 21, 2012, Cathy, Teresa, and Linda went to Conemaugh Hospital to discuss with [the Testator] whether he would return home and which sister would provide him care. The discussion occurred in [the Testator's] room, and Dr. Spencer also participated in the conversation. Dr. Spencer explained that [the

Testator] was permitted to go home, but Teresa insisted that he return to Atrium Manor. Teresa eventually stormed out of the room because she was so upset that Dr. Spencer permitted [the Testator] to go home. Ultimately, [the Testator's] wishes controlled his commitment. [The Testator] decided that Cathy, Linda, and Teresa would act as his decision makers, in the event he could not, and that he would return home. Thereafter, Teresa[,] using her power of attorney[,] fired Dr. Spencer as Anna's physician, although Dr. Spencer was still [the Testator's] physician.

Subsequently, Anna and [the Testator] discovered that several items were missing from their home. Cathy would accuse Teresa of stealing the Murrays' antiques, and Teresa would accuse Cathy of the same. Teresa indeed removed several items from the home but claimed that she returned them. However, several items were never located. In agreement that Teresa was the alleged wrongdoer, the Murrays ([the Testator] and Anna) requested that Cathy exclude Teresa from the Murrays' lives, and Cathy complied. Thus, Cathy and Linda became the Murrays' exclusive familial caretakers.

On September 25, 2012, [the Testator] executed a General Durable Power of Attorney, which appointed Cathy as his attorney-in-fact. On October 4, 2012, Anna revoked the power of attorney that she had granted Teresa.

Anna passed away on October 9, 2012. Unsurprisingly, Anna's death devastated [the Testator], causing him to become depressed and even more confrontational. Dr. Spencer prescribed medications to [the Testator], which aimed at treating his depression and agitation. The medication was effective, reducing his hostility when under its influence. Although the medication tempered [the Testator's] behavioral issues, it did not affect his cognitive abilities in any way. Shortly after Anna's death, Cathy hired two professional caretakers—Susan Holsopple, [LPN], and Lori Shank, [LPN],—to aid her in providing [the Testator] with care.

On November 9, 2012, [the Testator] was hospitalized to treat a urinary tract infection. The infection caused [the Testator] to become confused and delirious. While [the Testator] was being treated for the urinary tract infection, Teresa attempted to visit [the Testator], but the hospital staff explained that, at Cathy's direction, they could not allow Teresa to visit [the Testator]. A letter dated November 18, 2012, which was signed by [the

Testator] and Cathy, confirmed [the Testator's] decision to exclude Teresa.

On November 23, 2012, Conemaugh Hospital discharged [the Testator] to the LaurelWood Care Center, an intermediate eldercare facility. Despite receiving notice that [the Testator] did not want her to visit, Teresa went to visit [the Testator] at LaurelWood. The staff informed her that she was not welcome, but Teresa persisted and went into [the Testator's] room. This was Teresa's last encounter with [the Testator]. Thereafter, [the Testator's] infection ceased, and, consequently, his delirium and confusion concluded. Accordingly, [the Testator] was permitted to return home, which he did.

After [the Testator] returned home from LaurelWood, his normal temperament resumed. He was still ornery, but his autonomy, volition, quick wit, sense of humor, and intellect were in full effect. [The Testator] frequently joked with one of his professional at-home nurses, Ms. Holsopple. Ms. Holsopple found that [the Testator] "always did what he wanted." Additionally, [the Testator's] other nurse, Ms. Shank, would often have conversations with [the Testator] regarding his antiques, and her interaction with [the Testator] demonstrated that he remained fully aware, self-determined, engaged, capable of giving direction, and expressive.

One day in early December of 2012, [the Testator] told Ms. Shank that he wanted to change his will and get all of this testamentary affairs in order. Ms. Shank called Cathy and told her that [the Testator] wanted a new will. [The Testator] continued to remind Ms. Shank that he wanted a new will, and she would inform him that she had let Cathy know.

On December 22, 2012, Cathy asked Ms. Shank and Ms. Holsopple to be witnesses to [the Testator's] execution of his new Last Will and Testament. While Cathy did some chores around the home, Ms. Holsopple read the will to [the Testator] in the presence of Ms. Shank. Ms. Holsopple would read a portion of the will, confirm that [the Testator] understood it, and continue reading. After she finished, Ms. Holsopple asked [the Testator], once more, whether he understood everything, and he confirmed that he did. [The Testator] then signed the will, and Ms. Holsopple and Ms. Shank signed as witnesses. [The Testator's] Last Will and Testament named Cathy Marshall as the execut[rix] of his estate, made relatively small specific bequests to Teresa Warner, Linda Balon, Jean Updyke[,] and others, and left the remainder of his

estate to Cathy Marshall. [As indicated supra, the Testator died on January 15, 2013.]

Orphans' Court Opinion, filed 1/29/20, at 1-8 (citations to record omitted) (footnote added).

After Contestants presented their witnesses, Cathy orally requested the Orphans' Court dismiss Contestants' appeal from the Register of Wills on the basis they failed to adduce clear and convincing evidence that the Testator lacked testamentary capacity or that the December 22, 2012, will was the product of undue influence. Id. at 10. The Orphans' Court agreed, and, on November 15, 2019, the Orphans' Court entered a final Decree dismissing the appeal from the Register of Wills. Contestants filed a timely notice of appeal to this Court.[4] All Pa.R.A.P. 1925 requirements have been met.

On appeal, Contestants set forth the following issues in their "Statement of Questions Presented" (verbatim):

1. Was the evidence clear and convincing to sustain a requisite finding of weakened intellect of the Testator, Earl Phillip Murray, when the Last Will and Testament was executed on December 22, 2012, as set forth in Estate of Nalaschi, 90 A.3d 8, 14, 2014 Pa.Super. 73 (Pa.Super. 2014) ("[weakened intellect] is typically accompanied by persistent confusion,

_____

[4] We note that Pennsylvania Orphans' Court Rule 8.1 relevantly provides "no exceptions or post-trial motions may be filed to any order or decree of the [orphans'] court." Pa.O.C.R. 8.1. See In re Estate of Smaling, 80 A.3d 485 (Pa.Super. 2013) (en banc) (holding that neither exceptions nor post-trial motions are required to preserve issues for appellate review in appeals from the Orphans' Court's decrees).

> forgetfulness and disorientation."), to establish undue influence?
>
> 2. Was the evidence clear and convincing to sustain a requisite finding that a confidential relationship existed between the Testator, Earl Phillip Murray, and Catherine Marshall, when the Last Will and Testament was executed on December 22, 2012, as set forth in Estate of Ziel, 467 Pa. at 542, 359 A.2d at 734 (Pa. 1976) (A confidential relationship exists whenever "circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed [for] in both [situations] an unfair advantage is possible."), to establish undue influence?

Contestants' Brief at 2 (suggested answers omitted).[5]

Contestants' appellate issues are intertwined. Specifically, they contend the Orphans' Court erred in concluding Contestants did not establish by clear and convincing evidence that the Testator's December 22, 2012, will was the produce of undue influence in that, when the will was executed, the Testator suffered from a weakened intellect, was in a confidential relationship with Cathy, and Cathy received a substantial benefit from the will.

Initially, we note the appropriate scope and standard of review on appeal from a Decree of the Orphans' Court adjudicating an appeal from probate is as follows:

> In a will contest, the hearing judge determines the credibility of the witnesses. The record is to be reviewed in the light most favorable to appellee, and review is to be limited to

---

[5] Contestants have abandoned on appeal their argument that the Testator lacked testamentary capacity. Accordingly, we shall not address the issue further. See Pa.R.A.P. 2119 (setting forth briefing requirements pertaining to an appellant's argument).

determining whether the [Orphans'] [C]ourt's findings of fact were based upon legally competent and sufficient evidence and whether there is an error of law or abuse of discretion. Only where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence may the court's findings be set aside.

In re Estate of Schumacher, 133 A.3d 45, 49-50 (Pa.Super. 2016) (citation omitted).

"The resolution of a question as to the existence of undue influence is inextricably linked to the assignment of the burden of proof." In re Estate of Clark, 461 Pa. 52, 334 A.2d 628, 632 (1975). Once the proponent of the will in question establishes the proper execution of the will, a presumption of lack of undue influence arises; thereafter, the risk of non-persuasion and the burden of coming forward with evidence of undue influence shift to the contestant. Id. The contestant must then establish, by clear and convincing evidence, a prima facie showing of undue influence by demonstrating that: (1) the testator suffered from a weakened intellect; (2) the testator was in a confidential relationship with the proponent of the will; and (3) the proponent receives a substantial benefit from the will in question. Id. Once the contestant has established each prong of this tripartite test, the burden shifts again to the proponent to produce clear and convincing evidence which affirmatively demonstrates the absence of undue influence. Id.

In re Estate of Smaling, 80 A.3d 485, 493 (Pa.Super. 2013) (en banc) (footnote omitted).

In the case sub judice, Contestants do not dispute on appeal that the December 22, 2012, will was properly executed. As such, the Contestants had the burden of coming forward with evidence to establish undue influence. See id. In its opinion, the Orphans' Court reviewed the testimony presented during the trial, as well as the joint stipulations, deposition testimony, and joint exhibits entered into evidence. Based thereon, the Orphans' Court made

relevant credibility determinations and concluded that, while Contestants demonstrated Cathy received a substantial benefit from the will in question,[6] they failed to establish, by clear and convincing evidence, a prima facie case that the Testator "suffered from a weakened intellect during the relevant period [or] that there was a confidential relationship between Cathy and [the Testator]." Orphans' Court Opinion, filed 1/29/20, at 12 (citation to record omitted). We find no error in this regard.

With regard to the Contestants' claim of "weakened intellect," as Contestants aver, this Court has previously stated:

> [W]eakened intellect in the context of a claim of undue influence need not amount to testamentary incapacity and will generally be proven through evidence more remote in time from the actual date of the will's execution. While Pennsylvania courts "have not established a bright-line test by which weakened intellect can be identified to a legal certainty, they have recognized that it is typically accompanied by persistent confusion, forgetfulness and disorientation." In re Estate of Fritts, 906 A.2d 601, 607 (Pa.Super. 2006) (citations omitted). Importantly, in an undue influence case, "[the Orphans' Court] has greater latitude to consider medical testimony describing a [testator's] condition at a time remote from the date that the contested will was executed." Id. (citation omitted). We will not revisit the [Orphans' Court's] conclusions when they rest on legally competent and sufficient evidence. Id.

_____

[6] We note that a finding of substantial benefit "must depend upon the circumstances of each particular case." In re Estate of Smaling, 80 A.3d at 498 (quotation marks and quotation omitted). In the case sub judice, the Testator's December 22, 2012, will left the bulk of his estate to Cathy. Therefore, we agree with the Orphans' Court's conclusion that Contestants demonstrated Cathy received a substantial benefit from the will.

In re Estate of Nalaschi, 90 A.3d 8, 14 (Pa.Super. 2014) (quotation marks and quotation omitted). See Estate of Fabian, 222 A.3d 1143, 1150 (Pa.Super. 2019) (setting forth standard for determining "weakened intellect").

In the case sub judice, in concluding Contestants failed to carry their burden of demonstrating the Testator suffered from a weakened intellect, the Orphans' Court relevantly indicated the following:

> [T]he weakened intellect inquiry centers around whether the testator's mental state was conducive to exploitation.
>
> [C]ontestants predominantly relied upon two facts in support of their claim that [the Testator] suffered from a weakened intellect. First, [Contestants] point to the fact that [the Testator] was prescribed medication for his agitation and depression, which they asserted diminished [the Testator's] intellect. Second, [Contestants] pointed to the fact that [the Testator] was admitted to the hospital on several occasions to address his behavior issues, which they asserted demonstrated a progressive weakening of [the Testator's] mind.
>
> * * *
>
> [Contestants] failed to demonstrate, by clear and convincing evidence, that [the Testator] suffered from a weakened intellect during the relevant period.
>
> [The Testator] was prescribed medication to treat his depression and agitation. However, that medication did not affect [the Testator's] cognitive abilities; it merely alleviated his depression and agitation. During the time that Cathy served as [the Testator's] caretaker, Dr. Spencer prescribed [the Testator] Trazodone and Lexapro for his depression, and she prescribed him Ativan for his agitation. Joint Ex. 2 at 60-61. During her deposition, Dr. Spencer explained that those medication should not affect his cognitive abilities. Consequently, we [do] not conclude that the medication weakened his intellect. While Dr. Spencer explained that it was possible the medication could affect [the Testator's] cognitive abilities considering his age, she never testified that it actually did. Further, no evidence adduced at [the]

trial indicated that the medications did anything beyond reducing [the Testator's] agitation. Thus, we [do] not conclude that the medications caused [the Testator] to suffer persistent confusion, forgetfulness, or disorientation.

Further, [the Testator's] intermittent episodes of confusion, forgetfulness, and disorientation did not establish by clear and convincing evidence that he suffered a weakened intellect. [The Testator's] first episode of confusion occurred on September 15, 2012. Joint Ex. 2 at 37. However, he recovered almost immediately upon his hospitalization, which Dr. Spencer found remarkable. She explained that his confusion seemed to occur because "he was having a great deal of difficulty coping with his wife's illness." Because of [the Testator's] rapid recovery and the doctor's explanation, we found that he suffered confusion because he was separated from his wife in her final days. [The Testator's] second episode of confusion and delirium occurred in November. However, this episode exclusively resulted from his urinary tract infection. As soon as the infection ceased, so did [the Testator's] confusion and delirium. Both of these episodes occurred in response to specific causes. After the relevant causes ceased, so did any confusion, forgetfulness, or disorientation. The requisite confusion, disorientation, and forgetfulness must be persistent. Estate of Fabian, [supra]. However, [the Testator] only suffered two temporary periods of confusion and delirium. Further, [the Testator's] nurses, who were with [the Testator] from November until his death, described [the Testator] as normally being humorous, capable of giving direction, ornery, self-determined, and expressive. Joint Ex. 3 at 24; Joint Ex. 4 at 16-17, 36-38. Further, [the Testator's] independent decision to make a new will and the predicating beliefs were formed while [the Testator] was psychologically healthy. Thus, the evidence adduced at [the] trial failed to establish that [the Testator] suffered from a prolonged weakened intellect such that he was susceptible to undue influence by Cathy[.]

Orphans' Court Opinion, filed 1/29/20, at 18-20.

We conclude the Orphans' Court's decision rests upon legally competent and sufficient evidence, and therefore, we do not revisit its conclusions. In re Estate of Smaling, supra. Based upon the foregoing, we conclude that

- 14 -

the Orphans' Court did not abuse its discretion when it concluded the Testator was not suffering from a weakened intellect in the months and years leading up to the execution of the December 22, 2012, will. Id.

With regard to Contestants' claim that a confidential relationship existed between the Testator and Cathy, this Court has held:

> [A] confidential relationship exists when the circumstances make it certain that the parties did not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed. A confidential relationship is created between two persons when it is established that one occupies a superior position over the other—intellectually, physically, governmentally, or morally—with the opportunity to use that superiority to the other's disadvantage. [S]uch a relationship is not confined to a particular association of parties, but exists whenever one occupies toward another such a position of advisor or counselor as reasonably to inspire confidence that he will act in good faith for the other's interest.

In re Estate of Smaling, 80 A.3d at 498 (citations, quotation marks, and quotations omitted). See In re Estate of Ziel, 467 Pa. 531, 359 A.2d 728, 734 (1976) ("A confidential relationship in this sense exists whenever 'the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed (for) in both (situations) an unfair advantage is possible.'") (quotation omitted)); In re Estate of Fritts, 906 A.2d at 608 ("[A confidential relationship] is marked by such a disparity in position that the inferior party places complete trust in the superior party's

advice and seeks no other counsel, so as to give rise to a potential abuse of power.") (citations omitted)).

In the case sub judice, in concluding Contestants failed to carry their burden of demonstrating Cathy enjoyed a confidential relationship with the Testator, the Orphans' Court relevantly indicated the following:

> Essentially, a confidential relationship exists where clear and convincing evidence demonstrates that the relationship is conducive to exploitation. In their effort to prove [the Testator] and Cathy's relationship was conducive to exploitation, [Contestants] relied upon their assertion that [the Testator's] frustration with Teresa, which caused [the Testator] to remove her from his home and will, resulted from Cathy feeding [the Testator] information that he trusted because of the aid she provided him. Additionally, they relied upon the fact that Cathy possessed a power of attorney over [the Testator].
>
> [Contestants] failed to establish, by clear and convincing evidence, that a confidential relationship existed between Cathy and [the Testator] for several reasons. First, the testimony that indicated Cathy['s] caretaking role allowed her to influence [the Testator's] beliefs was either not credible or contradicted by more credible evidence. Further, [the Testator] based his testamentary decisions upon reasoning that predated Cathy['s] presence in [the Testator's] life, and [the Testator] alone directed that he wanted a new will. Last, the evidence established that [the Testator] was an incredibly self-determined individual, and the other evidence failed to establish that Cathy['s] relationship with him gave her the power to overcome [the Testator's] obdurate manner....
>
> In her testimony, Teresa speculated that Cathy was coaxing [the Testator] to make certain decisions, including his decision to exclude Teresa from the Murrays' lives. We did not find this testimony credible for three reasons. First, Teresa had a significant interest in the outcome of this litigation because under [the Testator's] December will Cathy received the bulk of the estate, but under [the Testator's] earlier will Teresa received the bulk of the estate. Second, significant animosity existed between Teresa and Cathy, which partially resulted from their disagreement about whether [the Testator] should remain in his home as his wife['s] [health] declined. Teresa's animosity toward

- 16 -

Cathy rendered her testimony about the nature of [the Testator] and Cathy's relationship less credible. Third, the credible evidence adduced at [the] trial contradicted any testimony that indicated Cathy had the ability to unduly influence [the Testator's] decisions and beliefs. [The Testator's] frustration with Teresa predated the period when Cathy regained her presence in the Murrays' lives. To wit, [the Testator] attempted to forcefully remove Teresa and Rick Warner from his home on September 5, 2012, which was before Cathy first visited [the Testator] at Atrium Manor. Additionally, [the Testator] blamed Teresa for his separation from his dying wife, Anna. Cathy did not create that belief. During their marriage, [the Testator] and Anna were inseparable, but Teresa advocated for [the Testator's] exclusion from the home during Anna's last days, which infuriated [the Testator]. Moreover, [the Testator's] and Anna's belief that Teresa was stealing from the home resulted from their own observations. [The Testator] and Anna were both aware that Teresa had removed several items from the home. Despite Teresa's assertions that she returned those items, many items were never located. Accordingly, we did not determine that Cathy had convinced [the Testator] which family members to exclude from his life. [The Testator] made those decisions based upon his independently formed beliefs, and Cathy assisted him in carrying them out.

Additionally, [the Testator's] decision to execute a new will in December of 2012 was predicated upon the same reasoning as his decision to execute the February of 2012 will. When a caretaker ceased providing care for [the Testator] or disagreed with his wishes, he became upset with them and decided to prohibit them from taking under his will. After Linda Balon stopped providing the Murrays care in 2011 and Teresa assumed Linda's role, [the Testator] retracted his desire to give Linda his estate and, instead, gave the bulk of his estate to Teresa. Similarly, after Teresa's caretaking role ceased and Cathy's role began, [the Testator] retracted his desire to give Teresa the bulk of his estate. Because [the Testator] premised his decision to remove Teresa from his will upon the same reasoning as his decision to exclude Linda, we fail to identify how Cathy Marshall influenced [the Testator's] testamentary decisions. Thus, [Contestants] did not convince us that Cathy advised [the Testator] to make certain testamentary decisions or that [the Testator] would have relied upon any alleged advice.

Further, Cathy never suggested to [the Testator] that he needed a new will. Rather, on his own accord, [the Testator] told his nurse, Ms. Shank, that he wanted to change his will and get all of his testamentary affairs in order. Ms. Shank then informed Cathy that [the Testator] wanted a new will. [The Testator] continued to remind Ms. Shank that he wanted a new will. After Cathy complied with [the Testator's] wishes and secured a will, [the Testator's] other nurse, Ms. Holsopple, read the will to [the Testator] and confirmed that he understood it. Cathy was not in the room while [the Testator] executed the will. The fact that [the Testator] independently determined that he wanted a new will and that Cathy was not immediately present during its execution further demonstrated that the December of 2012 Last Will and Testament did not result from any power that Cathy may have had over [the Testator]. [The Testator's] desire to execute a will was his own decision.

Moreover, [the Testator's] actions and statements during the relevant period consistently demonstrated [the Testator's] undying, autonomous nature. [The Testator's] volition was exclusively subject to his independently formed beliefs and desires. While [the Testator's] self-sufficiency diminished in 2012, his self-determination did not. [Contestants] failed to present evidence that established the relationship allowed Cathy Marshall to overcome [the Testator's] powerful self-determination. Indeed, the evidence adduced at [the] trial contravened a power disparity between [the Testator] and Cathy. [The Testator's] autonomy was so obvious that Ms. Holsopple noted that [the Testator] "always did what he wanted." Indeed, when a family member acted against [the Testator's] wishes, he attempted to exclude them from his life. Further, [Contestants] did not demonstrate that [the Testator] made a decision inconsistent with his prior decisions while Cathy was his caretaker. Rather, the relationship between the two predominantly consisted of Cathy implementing [the Testator's] self-determined wishes. The only witnesses who testified that Cathy had the ability to influence [the Testator] were those who [the Testator] excluded from his life, but we did not find those testimonies credible. Those witnesses were interested in the outcome of this case, spiteful, and contradicted the testimonies from disinterested witnesses. Thus, we [do] not conclude that [the Testator] and Cathy's relationship allowed Cathy Marshall to inculcate a belief or desire in [the Testator] that he did not already possess. While [the Testator] certainly trusted Cathy and granted her a power of attorney, those facts did not establish that he completely trusted her to the point

that Cathy could have potentially abused any power she possessed over [the Testator]. [The Testator] was autonomous—his beliefs and desired originated from within—and Cathy's relationship with him could not overcome that.

In sum, [Contestants] failed to establish, through clear and convincing evidence, that the relationship between Cathy and [the Testator] allowed Cathy to influence [the Testator's] decision-making. To the contrary, the evidence convinced us that [the Testator] made his own decisions for his own reasons and that Cathy Marshall was merely [the Testator's] advocate. [The Testator's] decision to return home rather than remain at Atrium Manor, his anger with Teresa, his decision to exclude Teresa and other family members from his home, and his desire to reduce Teresa's interest in his estate existed independently of the relationship between Cathy and [the Testator]. Cathy merely assisted [the Testator] in effectuating his volitions and providing him with care. Cathy's advocacy for [the Testator's] desires caused [the Testator] to favor her, but that favor was not strong enough to overcome [the Testator's] obduracy. Thus, Cathy Marshall neither possessed an overmastering influence over [the Testator] nor maintained a position of trust that created a potential for an abuse of any power she had. Consequently, [Contestants] failed to demonstrate, by clear and convincing evidence[,] that a confidential relationship existed.

Orphans' Court Opinion, filed 1/29/20, at 13-17 (citations to record omitted).

Based on the foregoing, we conclude that the Orphans' Court did not abuse its discretion in concluding that Cathy did not enjoy a confidential relationship with the Testator. The record supports the court's conclusion that Cathy and the Testator dealt on equal terms. Cathy did not have an overmastering influence over the Testator, and the Testator did not demonstrate weakness, dependence, or trust such that Cathy had an unfair advantage. See In re Estate of Smaling, supra.

In light of the aforementioned, we conclude the Orphans' court's findings of fact are based upon legally competent evidence. See In re Estate of Schumacher, supra. Resolution of this case hinged largely on the Orphans' Court's credibility determinations and its assessment of the testimonial and documentary evidence.

Simply put, Contestants have not convinced us that the Orphans' Court erred or abused its discretion in concluding Contestants failed to demonstrate the Testator's December 22, 2012, will should be voided due to undue influence. Id. Thus, we affirm the Orphans' Court's November 15, 2019, Decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/30/2020